STATE OF CONNECTICUT *v.* RALPH TROPIANO

KING, C. J., ALCORN, HOUSE, GRILLO and RUBINOW, Js.

Argued May 7—decided September 24, 1969

414

*Ira B. Grudberg,* with whom, on the brief, was *Howard A. Jacobs,* for the appellant (defendant).

*David B. Salzman,* assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, and *Richard P. Sperandeo,* assistant state's attorney, for the appellee (state).

ALCORN, J.   The defendant was convicted by a jury of the crime of conspiracy in violation of General Statutes § 54-197 and has appealed from the judgment rendered on the verdict and from the denial of his motions to set aside the verdict and for judgment in accordance with his motion for a directed verdict.   The information on which he was tried alleged, in substance, that between September 1, 1963, and February 20, 1964, he conspired with Anthony F. DiBella, Pasquale Guglielmo, Alfred J. Amaio and Paul Licari to offer money to police officers to secure protection for illegal gambling and liquor activities.   We have previously sustained the conviction of DiBella and Amaio for their part in the same conspiracy, the nature of which has been summarized in the opinion in that case.   *State* v. *DiBella,* 157 Conn. 330, 254 A.2d 477. We shall confine our factual recital in the present case to matters pertinent to the defendant's participation in the conspiracy and the various errors assigned in the proceedings which terminated in the verdict of the jury.

Among the thirty-five assignments of error are thirteen which attack findings made by the court. In passing upon the latter we are confronted with a

variety of errors assigned in five distinct findings. In advance of the trial to the jury, the defendant made a motion to suppress evidence, a motion to dismiss or quash the information, a motion to quash or strike the amended information, and a motion to sequester witnesses. In disposing of each of these motions, the court, sitting without a jury, made separate findings of fact which can be corrected only as provided in Practice Book § 628. Following the appeal, the court made a finding as required by Practice Book § 635 which can be corrected as provided in § 628 so far as that section is applicable. Practice Book § 636. This requires consideration of whether the finding relating to the jury trial includes the material facts concerning which "there was evidence upon the basis of which the jury could reasonably find a certain fact proven, and the appellant claimed to have proved it." Maltbie, Conn. App. Proc. § 160, p. 198. We have examined the assignments of error addressed to the five separate findings in the light of these principles and conclude that no corrections material to our decision are required.

The remaining assignments of error are prolix and confusing. By a repetitious admixture of attacks on rulings on evidence, on the charge of the court and on rulings on various motions, the defendant claims essentially, as set forth in his brief, that the court erred in refusing to direct a verdict of not guilty; that there was a fatal variance between the information and the proof; that the court erred in failing to charge the jury that acts and statements of witnesses not made in the presence of the defendant could not be used against him; that the court erred in admitting hearsay declarations of coconspirators, in limiting cross-examination of state's

witnesses, in denying the defendant's motion to sequester witnesses, and in refusing to charge as requested; and that the defendant was illegally arrested on a warrant issued without probable cause supported by oath or affirmation.

# I

After the state and the defense had rested, the defendant moved for a directed verdict on the ground that the evidence was insufficient to prove the defendant's guilt beyond a reasonable doubt. The court denied the motion, and that denial is assigned as error. After the jury had returned a verdict of guilty, the defendant moved to set aside the verdict and for judgment in accordance with his motion for a directed verdict. This motion also was denied, and that denial is assigned as error.

The correctness of the court's ruling on each motion must be tested by the evidence printed in the appendices to the briefs. *State* v. *Mortoro,* 157 Conn. 392, 393, 254 A.2d 574; *State* v. *Gyuro,* 156 Conn. 391, 397, 242 A.2d 734, cert. denied, 393 U.S. 937, 89 S. Ct. 301, 21 L. Ed. 2d 274. It was the state's burden to prove that the defendant did some act which actually was in furtherance of the purposes of the general conspiracy and that, when he did it, he had a guilty intent and knew that what he was doing was a part of a general scheme to commit some of the unlawful acts alleged in the information. *State* v. *Hayes,* 127 Conn. 543, 563, 18 A.2d 895.

From the evidence before them the jury could reasonably have concluded that a gambling operation, involving men from New Haven, had been in the planning stage for about a year prior to September 17, 1963. On that date, Guglielmo approached Francis Reynolds, a detective in the West Hartford

police department, with an offer of between $10,000 and $12,000 for police protection of the operation. Thereafter DiBella entered the picture, and extensive discussion followed for a considerable period of time with the objective of arranging for protection of illegal operations in New Haven as well as in West Hartford by enlisting the aid of Stephen P. Ahern, a sergeant in the New Haven police department. On January 30, 1964, DiBella informed Reynolds that the payoffs would be made from the defendant, who was the "top man", to DiBella, to Reynolds and from him to Ahern. After discussing the division of the payments, DiBella went to a telephone and on his return said: "Come on, we are going to New Haven." Reynolds and DiBella then drove to a restaurant in New Haven where they met Licari and the defendant, and DiBella introduced Reynolds as the man he had been "talking about the deal with." Licari and DiBella then left Reynolds and the defendant alone in a booth at the restaurant, and the defendant told Reynolds: "The only thing I want from Ahern are the crap games. Horses can come later."

Reynolds asked the defendant how much Ahern was to get, and the defendant said: "Quote a figure." Reynolds quoted $475 to $500 a week, and the defendant voiced approval of the amount suggested. The defendant said that he wanted the crap games operated every night of the week otherwise they would "get cold and the people would go to Bridgeport." Following this conversation, Licari and DiBella returned to the booth, and, after discussion concerning Licari, who was going to run the crap games, DiBella and Reynolds went home.

From the evidence recited the jury could properly conclude that the defendant's own conduct clearly

identified him as an active participant in an illegal conspiracy. *State* v. *Hayes,* supra. The court did not err in refusing to direct a verdict of not guilty or in denying the motion to set aside the verdict.

At the conclusion of the evidence, the defendant moved to strike certain of the testimony of Guglielmo, Reynolds and Ahern because the state had not offered independent evidence of the conspiracy and the defendant's connection with it sufficient to make the testimony admissible. Recitation of further facts is unnecessary since it is apparent that the court did not err in denying the motion.

## II

The claim made in the brief that the proof at the trial was at fatal variance with the information is not specifically assigned as error and consequently is not properly raised. Practice Book § 651. Argument on the point insinuates itself into the case through the errors assigned in the denial of the motions to direct and to set aside the verdict, and through an assignment that the court erred in refusing eleven requests to charge, four of which related to the distinction to be drawn between a single conspiracy and several conspiracies. The purport of the argument is that the court should have charged that the state was required to prove a single conspiracy in order to convict the defendant and that a conviction could not be had if the jury concluded that the several defendants engaged in separate conspiracies even though one conspirator engaged in all of them.

The amended information charged the defendant with conspiring with the other named persons to offer money to police officers to influence their conduct so that illegal gambling and liquor operations

could be conducted in Hartford, New Haven and other counties and specified ten overt acts in furtherance of that conspiracy. The finding is that the state offered evidence to prove and claimed to have proved nine of the overt acts alleged. The defendant does not contend otherwise but asserts that the state's claims of proof established five separate conspiracies. In an endeavor to support this claim, the defendant utilizes overt acts which, in actuality, are individual facets of the single conspiracy charged.

The defendant makes no claim that he offered to prove, or proved, multiple conspiracies. Instead, he contends that "based upon the State's evidence" the court committed error in refusing his requests to charge concerning the state's burden of proving the single conspiracy alleged. We have examined the charge on this phase of the case and conclude that it was adapted to the issues and adequate for the guidance of the jury. *Berniere* v. *Kripps,* 157 Conn. 356, 358, 254 A.2d 496; *Lopes* v. *Connecticut Light & Power Co.,* 145 Conn. 313, 315, 142 A.2d 135.

### III

Detective Reynolds had immediately reported to his superiors at police headquarters the proposition made to him on September 17, 1963, by Guglielmo. Thereafter, meetings which he had with the conspirators were under the surveillance of the West Hartford police, and tape recordings were made of telephone conversations which he had with DiBella. These recordings and the stenographic transcriptions made of them were introduced into evidence. When they were introduced, counsel for the defendant requested the court to charge the jury that Rey-

nolds' parts of the conversations were not binding on the defendant because Reynolds was not a coconspirator and had said nothing in such a capacity. Counsel for the defendant also filed a written request to charge that "[t]he acts and declarations of Reynolds and Ahern, outside the presence of this defendant, are not evidence against him."

The substance of the conversations concerned the defendant's role in the conspiracy, and the defendant concedes that the court did not err in receiving the recordings and transcripts in evidence.

Although Reynolds' part in the conversations was not admissible to prove the truth of any assertions made by him, since he admittedly was not a coconspirator, nevertheless his portion of the conversation was admissible for the limited purpose of giving meaning and coherence to DiBella's statements. See *United States* v. *Morello,* 250 F.2d 631, 634 (2d Cir.) ; 7 Wigmore, Evidence (3d Ed.) §§ 2097, 2099. The admission of the entire conversation tended to eliminate the possibility that the jury would interpret the meaning of DiBella's statements out of context rather than to prejudice the defendant.

Cautionary instructions concerning the effect which the jury should give to statements made by DiBella as distinguished from those made by Reynolds were called for, however. *United States* v. *Morello,* supra. Nevertheless, the court was not required to adopt the exact language of the defendant's request so long as it gave the jury a clear understanding of the issue and a proper guidance in determining it. *State* v. *Alterio,* 154 Conn. 23, 27, 220 A.2d 451, and cases cited.

An examination of the charge discloses that the court told the jury specifically that the information

charged the defendant with conspiring with Guglielmo, DiBella and Amaio, to the exclusion of the police officers and Licari. The court explained that Licari had been tried and acquitted of conspiracy previously and that the state claimed that the officers took money only as evidence of the conspiracy alleged. The jury were told that acts or declarations of a coconspirator did not involve the defendant until he had been proved to be a member of the conspiracy by other evidence but that once he had been proved to be a member of the conspiracy the declarations of a coconspirator in furtherance of the conspiracy were admissible against him.

It was thus made clear to the jury, by specific identification, who the conspirators were alleged to be. Not only were the officers excluded from that category but the charge abundantly emphasized to the jury that the part which the officers played in the scheme of things was to bring the conspirators to justice. The charge of the court adequately alerted the jury to the fact that only the acts and declarations of coconspirators in furtherance of the conspiracy could be used against the defendant. This statement necessarily excluded the acts and declarations of the officers, and this was the substance of the defendant's request to charge. *United States* v. *Morello,* supra.

## IV

The defendant assigns error in rulings of the court in admitting into evidence statements made by coconspirators.

Reynolds testified to a conversation with Guglielmo in which Guglielmo said that the deal was still on. Reynolds asked him if he was serious, and Guglielmo said, "You don't think I would be kidding

about something like this?" After a discussion about the money involved and the division of it, Reynolds asked if Guglielmo had had any further meetings in New Haven, and he said, "No. I don't want to be seen with that type of crowd." As the answer continued, the defendant's counsel objected that it was narrative and not within the coconspirators exception, but the court allowed the answer to be completed.

Included in the recordings of telephone conversations, and the stenographic transcriptions thereof already referred to, were statements made by DiBella in a conversation with Reynolds in which DiBella said, "Well, you see, Whitey [meaning Tropiano]—nobody is ever gonna catch him. Whitey is got operations going that he ain't got no part of himself and they're running because no matter how many times they catch his men his men are—they'll die." DiBella also said, "—you can never tell whether its part of his [Tropiano's] operation. But, without him the town don't run." The defendant's counsel objected to both statements on the ground that they constituted narrative and were not in furtherance of the conspiracy, and the court overruled the objection.

Included in the recordings and the stenographic transcriptions was a statement by DiBella to Reynolds, "That's right. He'll—he'll honor Mr. Ahern in his own particular way—it'll be a crude way— he'll say 'I don't know—you know what he wants, he's waiting for me to get myself off guard, but he ain't gonna catch me.' " The defendant's counsel objected on the ground that the statement constituted speculation on DiBella's part and was his interpretation of the operation of someone else's mind, and the court overruled the objection.

The defendant now argues that the statements quoted were not made in furtherance of the conspiracy and so were not admissible under the so-called coconspirators exception to the hearsay rule. The rule that any declaration made by a coconspirator, pursuant to the common object of the conspiracy and in furtherance of it, is admissible against all of the conspirators once the combination is established was enunciated by this court over one hundred years ago in *Cowles* v. *Coe,* 21 Conn. 220, 234. In more recent times, the requirement that the declaration be in furtherance of the conspiracy has been the subject of discussion. Professor Edmund M. Morgan in "The Rationale of Vicarious Admissions," 42 Harv. L. Rev. 461, has urged that that requirement of the rule be eliminated since the trustworthiness of the declaration is guaranteed by the circumstance that (p. 481) "the fact stated is consciously against the interest of the declarant." See also Model Code of Evidence rule 508 (b) ; Uniform Rule of Evidence 63 (9) (b), 9A U.L.A.; Levie, "Hearsay and Conspiracy, A Reexamination of the Co-Conspirators' Exception to the Hearsay Rule," 52 Mich. L. Rev. 1159, 1167; note, "Developments in the Law [of] Criminal Conspiracy," 72 Harv. L. Rev. 920, 985.

The defendant relies heavily on *Krulewitch* v. *United States,* 336 U.S. 440, 69 S. Ct. 716, 93 L. Ed. 790, in which the court appears to reject Professor Morgan's suggestion, although the conversation involved in that case took place after the conspiracy had ended and concerned an anticipated criminal prosecution. Any detailed discussion of the soundness of the portion of the rule which requires statements of coconspirators to be "in furtherance of the conspiracy" is, however, unnecessary in the present

case. In the first place, the statements objected to were clearly made during the pendency of the conspiracy, and the defendant does not contend otherwise. Furthermore, even though the statements, in part, may be interpreted to refer to past facts, they were part and parcel of the discussions concerning the bribe payments and were obviously made for the purpose of reassuring Reynolds of the soundness and prospective completion of the proposition made to him. Any references to past facts were natural and pertinent to the conspiracy and were therefore in furtherance of it. *United States* v. *Pardo-Bolland,* 348 F.2d 316, 324 (2d Cir.), cert. denied, 382 U.S. 944, 86 S. Ct. 388, 15 L. Ed. 2d 353; *United States* v. *Annunziato,* 293 F.2d 373, 380 (2d Cir.), cert. denied, 368 U.S. 919, 82 S. Ct. 240, 7 L. Ed. 2d 134. The statements which are claimed to be speculation and interpretation of the operation of someone else's mind by DiBella were, even if characterized as expressions of opinion, based on DiBella's own personal knowledge. See *Stephanofsky* v. *Hill,* 136 Conn. 379, 382, 71 A.2d 560. Like the other statements they were calculated to reassure Reynolds of the soundness of the proposition made to him. The court did not err in admitting the testimony.

## V

The defendant assigns error in rulings of the court during his cross-examination of witnesses for the state.

During cross-examination of Reynolds, the witness stated that his recollection was exhausted. Defense counsel then asked Reynolds when he had last looked at any records, transcript or otherwise, concerning the subject under inquiry, and Reynolds

said he could not recall. Defense counsel then asked whether the witness' recollection was refreshed "whenever it was you looked over your notes." The state objected that "[i]t's recollection that's being refreshed at this time, not at some other time," and the court sustained the objection. The ruling was correct. Another ruling improperly conjoined in this assignment requires no discussion.

In cross-examining Guglielmo, defense counsel questioned him concerning a statement which he read from the transcript of a former trial and which was not an exhibit. On objection by the state, the court stopped the reading, stating that counsel could not read from the record "without turning in the record." The defendant now claims that the ruling balked him from showing a prior inconsistent statement of the witness. The defendant does not point to the alleged inconsistency, and the transcript discloses none.

In cross-examining Reynolds concerning the dates of several conversations, the witness said he could not recall but could answer exactly if allowed to look at his notes. Defense counsel did not allow the witness to refresh his recollection from his notes, and the court refused to permit a repetition of questions which the witness had said he could not answer from his present recollection. There was no error in that exercise of the court's discretion.

On direct examination Reynolds had testified that he met Sergeant Ahern when he arrived at a parking lot for a meeting with DiBella on February 13, 1964. In a previous trial he had testified that Ahern drove in after he and DiBella had arrived. This variance in his testimony was pointed out by defense counsel in cross-examination. Defense counsel now makes the footless complaint that the court,

after examining a report made by Reynolds to his superiors, which included the details recorded in a memorandum made by him of the meeting of February 13, 1964, both of which had been marked for identification, found no inconsistency in them beyond what was already in evidence and therefore refused to allow further cross-examination on the incident by reference to the documents.

Before the trial of the defendant began, Guglielmo had pleaded guilty to the same crime as that with which the defendant was charged and had received a suspended sentence. At the start of the defendant's trial, the court informed the jury that Guglielmo had pleaded guilty. This was the fact, although that plea was entered after an earlier not guilty plea. On cross-examination, defense counsel asked Guglielmo whether, before trial, he had pleaded not guilty; whether he was sentenced "after the last case was disposed of"; and whether, before the last case started, he had conferred with the state's attorney as to what his testimony would be. The state's objection to each question was sustained. Defense counsel stated as the ground for admissibility: "I am entitled to go into the question of motive for testimony."

The questions were admissible for the purpose of attacking the witness' credibility on the ground of motive, interest, or bias. *State* v. *Luzzi*, 147 Conn. 40, 46, 156 A.2d 505. Subsequent cross-examination indicates that the defendant's apparent objective was to indicate to the jury some motive, bias, or interest in the witness by suggesting that promises of leniency were made to him which were productive of the change of plea and which resulted in the suspended sentence. The rulings of the court excluding the questions for the purpose stated were

erroneous. In order to constitute reversible error, however, the rulings must have been both wrong and harmful. *State* v. *Fredericks,* 154 Conn. 68, 72, 221 A.2d 585. If the record discloses that the rulings could not reasonably have affected the verdict, they were not harmful and hence not reversible error. *DeCarufel* v. *Colonial Trust Co.,* 143 Conn. 18, 21, 118 A.2d 798.

Guglielmo's direct testimony, which covers fifty-four pages of the trial transcript, shows that Guglielmo was offered by the state principally to explain Reynolds' connection with the case. His testimony under cross-examination by the defendant, which covers 122 pages of the trial transcript, dealt with his long acquaintance with, and proposal to, Reynolds, his introduction of Reynolds to DiBella, his talks with DiBella and Reynolds regarding Reynolds' proposed activity, and his express denial that he either offered any money to Reynolds or expected to receive or actually received anything from Di-Bella for approaching Reynolds. His testimony did not tend toward proof of the crime charged, and the verdict need not have been affected even if the jury chose to discredit his entire testimony. Under those circumstances the rulings complained of were harmless. *DeCarufel* v. *Colonial Trust Co.,* supra.

Beyond that, however, the transcript discloses that cross-examination continued after the objections to the questions in issue were sustained, during which, over objection by the state, and subsequent to the rulings complained of, the defendant was permitted to ask Guglielmo the direct question whether any promises had been made to him, and the witness answered, "There was no promises made." Thereupon, the defendant dropped the subject, made no attempt to test the answer he had received, and

continued his cross-examination, confining it to other matters. The defendant does not now claim that any promises were actually made to Guglielmo or that cross-examination to test his express denial of any promise was in any way restricted. Nor did the defendant attempt to question the witness concerning any circumstances surrounding either the pleas or the sentence which would tend to suggest even a hope or expectation of leniency productive of a motive or interest likely to affect Guglielmo's credibility. Our examination of the transcript discloses no curtailment of proper cross-examination which would render the rulings complained of harmful or prejudicial. See cases such as *People* v. *Smith,* 26 Cal. 2d 854, 858, 161 P.2d 941; *People* v. *Miceli,* 101 Cal. App. 2d 643, 647, 226 P.2d 14; *People* v. *Stone,* 89 Cal. App. 2d 853, 860, 202 P.2d 333.

Finally, Guglielmo's position as a self-confessed conspirator testifying for the state furnished a basis upon which the jury could, if it decided to do so, determine that he was a biased or interested witness. 3 Wigmore, Evidence (3d Ed.) § 967. The court, in effect, so charged, clearly described Guglielmo's status to the jury, and charged them that it required that they carefully scrutinize his testimony. The defendant received apparently free and full answers to his questions regarding Guglielmo's conferences with the state's attorney concerning his testimony. When viewed from every angle the rulings complained of were harmless.

## VI

Before the trial to the jury began, the defendant made a motion to sequester witnesses. The court denied the motion, and the denial is assigned as

error. The motion, which was in writing, stated, "The defendant Ralph Tropiano moves that the witnesses for the State be sequestered." No reasons were stated. In argument of the motion the defendant claimed that the essence of the state's case involved conversations between Guglielmo and Reynolds, Guglielmo and DiBella, and DiBella, Reynolds and Ahern. The claim was that sequestration of the witnesses was necessary in order to prevent them from unconsciously or consciously shaping their testimony. A similar motion was made and ruled on in *State* v. *DiBella,* 157 Conn. 330, 342, 254 A.2d 477, and the same principles as in that case apply here. Furthermore, in the present case, the court was cognizant of the fact that, as a result of the prior case, the witnesses named could be fully aware of the testimony elicited at that trial to which any coaching in the present case could add little. The court did not err in denying the motion. *State* v. *DiBella,* supra.

## VII

The defendant assigns error in the denial of his "motion to dismiss and/or quash" the information on the ground that the bench warrant under authority of which he was arrested was issued without a showing of probable cause supported by oath or affirmation.

At the hearing on the motion which took place prior to the trial, the court found that the defendant was arrested on February 20, 1964, by virtue of a bench warrant issued by a Superior Court judge on that date. Following the procedure which was then customary, the warrant was issued without oath or affirmation on the oral representation by the state's attorney that he had reasonable grounds to

believe that the crime charged had been committed within the jurisdiction. Counsel entered a general appearance for the defendant, and, on March 3, 1964, the defendant pleaded not guilty to the charge made against him. The information was later amended, and, on November 17, 1964, the defendant again entered a not guilty plea to the amended information. The motion to dismiss and/or quash the information was not made until September 20, 1965, the day preceding the start of the jury trial. Thus, no question was raised as to the validity of the arrest until nineteen months after issue was joined on the original information by a not guilty plea and ten months after a like plea to the amended information.

In *State* v. *Licari*, 153 Conn. 127, 214 A.2d 900, we said (p. 129) that an attack such as that now made on the court's jurisdiction of the defendant's person is one which should be made before a plea of guilty or not guilty and (p. 130) that a failure to move in timely fashion is strong evidence of consent to jurisdiction of the person (p. 131) although on the record in that case we could not, as a matter of law, find such consent. In *State* v. *Orsini*, 155 Conn. 367, 379, 232 A.2d 907, we said that the invalidity of the bench warrant was waived by a failure to raise the issue during the lapse of almost a year between the date of the arrest and the date of trial, and we alluded to circumstances indicative of the defendant's cognizance of the existence of the issue. See also *State* v. *Darwin*, 155 Conn. 124, 144, 230 A.2d 573, rev'd on other grounds, 391 U.S. 346, 88 S Ct. 1488, 20 L. Ed. 2d 630.

We have so recently discussed the proper and timely way in which to raise the issue attempted to be raised by the defendant's motion to dismiss that

the discussion need not now be repeated. *Reed* v. *Reincke,* 155 Conn. 591, 236 A.2d 909. "Proof of waiver of the illegality of an arrest and consent to the jurisdiction of the person can, and indeed does, in the absence of some mitigating factor not present here, rest on the record of the plea of guilty or not guilty." Id., 601.

The court did not err in denying the motion to "dismiss and/or quash" the information.

## VIII

The defendant assigns as error that the court refused eleven written requests to charge. Four of them related to the requirement that the state must prove a single conspiracy. These we have discussed in connection with the claim of variance. One, we have discussed in connection with the introduction into evidence of the tape recordings. Five others receive only cursory treatment in the defendant's brief, and an examination of the charge discloses that it substantially complied with the requests involved.

The one remaining attack on the charge concerns the subject of the defendant's failure to testify. The defendant filed a written request that the court charge as follows: "The defendant is not required to testify on his own behalf. The law gives him the right not to testify. Here the defendant Ralph Tropiano exercised his right not to testify. I instruct you that you must not consider the defendant's exercise of his right not to testify as evidence of guilt. You may draw no inference of any kind against the defendant because he did not testify." The court charged as follows: "From the fact that a man is presumed to be innocent, the next principle follows; namely, that the burden of proof is upon

the State throughout the trial to prove an accused guilty and an accused does not have to prove his innocence. That is to say, it is incumbent upon the State to carry the burden of proving its case in all its essential elements before a verdict of guilty may be rendered. Mr. Ralph Tropiano was under no obligation to go forward with witnesses to defend himself or to take the stand. No presumption, no inference of any kind should be drawn against him because he hasn't undertaken to testify or because he has not called witnesses in his own behalf. The accused had the right to testify if he so elects. He has the right to call witnesses and explained [sic] the case from his standpoint, but no inference of guilt should be drawn against him for the reason alone that he does not elect to exercise either of those rights; because, as I have said, he is presumed to be innocent and the State has upon it impressed by law the burden of overcoming that presumption and establishing beyond a reasonable doubt every essential element of the crime charged. And, until that is established by evidence beyond a reasonable doubt, the presumption of innocence is not overcome."

At the conclusion of the charge no exception was taken other than to the court's failure to charge as requested. Consequently, the error now assigned raises only the question whether the charge sufficiently covers the subject matter of the request. *McMahon* v. *New York, N.H. & H.R. Co.,* 136 Conn. 372, 375, 71 A.2d 557. "The failure to charge in the exact language of the requests is not error." *Mace* v. *Conde Nast Publications, Inc.,* 155 Conn. 680, 687, 237 A.2d 360.

The defendant now would complain of the court's use of the word "alone" and its failure to tell the

jury that the defendant "had the right not to testify." He urges that the implication is that no inference from his failure to testify could be drawn unless it is related to other factors in relation to his silence. Quite aside from the fact that the claim now made was not made the basis of an exception at the conclusion of the charge, the attempt to assert reversible error by culling a single word from the charge must fail unless it is reasonably probable that the jury were misled by it. *Penna* v. *Esposito,* 154 Conn. 212, 215, 224 A.2d 536. Considering the charge on this issue as a whole, as we must, we find no reasonable possibility that the jury were misled. The charge concerning the defendant's failure to testify was fully adequate for the guidance of the jury. *Michaud* v. *Gagne,* 155 Conn. 406, 412, 232 A.2d 326.

There is no error.

In this opinion the other judges concurred.