STATE OF CONNECTICUT *v.* JOSEPH TURCIO

COTTER, C. J., LOISELLE, BOGDANSKI, PETERS and PARSKEY, Js.

Argued January 9—decision released June 26, 1979

*Hubert J. Santos,* with whom, on the brief, was *A. Susan Peck,* for the appellant (defendant).

*Ernest J. Diette, Jr.,* assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, and *John T. Redway,* assistant state's attorney, for the appellee (state).

LOISELLE, J. The defendant was found guilty by a jury of twelve of causing the death of Frank Massaro, while committing or attempting to commit a robbery, in violation of General Statutes § 53a-54c and also guilty of the crime of assault in the first degree upon Jean Massaro, in violation of General Statutes § 53a-59 (a) (1) and of robbery in the first degree in violation of General Statutes § 53a-134 (a) (1). From the judgments rendered on the verdicts, the defendant has appealed.

On March 5, 1975, at about 8 p.m., the owners of Frank's Market on Foxon Road in East Haven, Frank and Jean Massaro, were closing their store. Mrs. Massaro went to their car first, carrying a cigar box containing money. After she and her husband got into their car, the defendant jumped in behind them waving a gun. Mrs. Massaro turned, saw the defendant's face, opened the car door, got out and ran screaming around the car. She was then shot in the back and fell to the ground. She heard another shot and saw her husband fall. The defendant then picked up the cigar box and ran. Frank Massaro died as a result of the shooting.

Both in his brief and at oral argument, the defendant conceded that the state had a "strong" case against him and that the real issue was whether he was so intoxicated from the use of drugs as to be incapable of forming the requisite intent required to be convicted of the crimes charged. To resolve this issue, both the state and the defendant introduced evidence as to the defendant's activities on

the day of the shootings and of his condition prior thereto, including the early morning hours of March 3, 1975, the details of which are discussed more fully in response to the defendant's claims of error in the charge and in certain evidentiary rulings.

The defendant has raised and briefed numerous claims of error. In this case, the maximum sentence was life imprisonment. It has been the policy of this court that in such situations, although the research and decision process is not affected, the opinion is more detailed than is otherwise warranted.

I

The defendant first contends that the court erred in charging the jury that it should weigh the testimony of a certain class of witnesses "with particular care." In presenting his defense, the defendant called a number of witnesses to testify in support of his claim that he was under the influence of drugs when he committed the crimes in question. Among those witnesses were the defendant's parents, Joseph Turcio, Sr., and Jeanette Turcio, his uncle Michael Liso, his friends David Leary and Robert Torres, and his former attorney, Fred D. Dahlmeyer. At the prosecution's request the trial court charged the jury as follows: "In weighing the credibility of a witness who is a member of defendant's family, or a friend, or an associate, or who bears a professional relationship to the defendant, you should scrutinize his or her testimony with particular care." Defense counsel excepted to this charge on the ground that there was a lack of balance.[1]

[1] The state contends that the grounds raised on appeal are different from those asserted at trial. From reading the record and the defendant's brief, it is apparent that the substance of the objec-

The issue as presented on appeal is whether it is permissible for the court to single out a particular class of witnesses and instruct the jury to scrutinize their testimony more carefully because they have a particular relationship with the defendant. In determining the credibility of a witness, the jury may take into account the fact that he stands in some legal or contractual relationship to a party which might affect his testimony, such as where the witness is an attorney, a relative, or a friend. As a general rule, "[a] court may not by an instruction deny to the jury the right to consider the interest of a party in determining the credit to which his testimony is entitled, but in instructing the jury as to the credibility of witnesses, may authorize them to take into consideration the interest of the witnesses, if any, in the result of the lawsuit, and in a proper case should caution the jury as to the care to be exercised in weighing the testimony of interested persons." 75 Am. Jur. 2d, Trials § 861, p. 743.

In an analogous situation, that of instructions concerning the alibi witness, this court has held that an instruction as to the interest of witnesses is correct and necessary: "On numerous occasions this court has stated that the trial court in a criminal case may, in its discretion, make fair comment on the evidence and particularly on the credibility of witnesses. See *State* v. *Tropiano,* 158 Conn. 412, 428, 262 A.2d 147; *State* v. *LaFountain,* 140 Conn. 613, 620, 103 A.2d 138; *State* v. *Pecciulis,* 84 Conn. 152, 158, 79 A. 75. In addition, we have also declared that an instruction on the credibility of

tion on appeal is basically the same as that made at the trial court and that the defendant clearly apprised that court of his objection. Therefore, the defendant's claim is addressed as presented here. *State* v. *Rado,* 172 Conn. 74, 81, 372 A.2d 159 (1976).

alibi witnesses similar to that challenged by this assignment of error is both proper and fair when weighed in the light of the other paragraphs of the charge. *State* v. *Groos,* 110 Conn. 403, 410, 148 A. 350; *State* v. *Cianflone,* 98 Conn. 454, 466, 120 A. 347 . . . . It is well recognized that the credibility of alibi witnesses is a subject as to which fair comment by the court to the jury is allowed. See *Sullivan* v. *Scafati,* 428 F.2d 1023 (1st Cir.), cert. denied, 400 U.S. 1001, 91 S. Ct. 478, 27 L. Ed. 2d 452; *Surridge* v. *State,* 239 Ark. 581, 393 S.W.2d 246; *Commonwealth* v. *Sullivan,* 354 Mass. 598, 239 N.E.2d 5, cert. denied, 393 U.S. 1056, 89 S. Ct. 697, 21 L. Ed. 2d 698; *State* v. *Griffin,* 336 S.W.2d 364 (Mo.); *Commonwealth* v. *Gates,* 392 Pa. 557, 141 A.2d 219; *Rogers* v. *State,* 455 S.W.2d 182 (Tenn. Crim. App.); *Bolin* v. *State,* 219 Tenn. 4, 405 S.W.2d 768." *State* v. *Cari,* 163 Conn. 174, 182, 303 A.2d 7 (1972). While the defendant here did not offer an alibi in the sense that he claimed to be somewhere else at the time of the shooting, the testimony offered by the witnesses in question went directly to his only defense, i.e., intoxication due to drug ingestion, and is, therefore, quite similar to the alibi defense in *Cari,* supra. See also *State* v. *Bennett,* 172 Conn. 324, 329–30, 374 A.2d 247 (1977); *State* v. *Jones,* 167 Conn. 228, 238, 355 A.2d 95 (1974).

The defendant further contends that the trial court's instructions[2] as to prior inconsistent statements and witnesses with prior felony convictions and ascertainable interests compounded the prob-

---

[2] The court instructed as follows:

"The state has the right to show any bias or interest toward the defendant on the part of witnesses for the defense. The evidence elicited from these witnesses, by cross-examination, concerning the nature of their relationship with the defendant, indicated long-term friendships with such witnesses as Mr. Torres and Mr. Leary, and

lem, because taken together with the "particular care" charge they suggested that certain defense witnesses should not be believed.[3]  The court was correct in its instructions on the credibility to be accorded witnesses with prior felony convictions, ascertainable interests or who had given prior inconsistent statements.  It was an unfortunate situation, but one. for which the trial court had no responsibility to compensate, that only those witnesses who had testified for the defendant fell into these categories.  The rule is well settled in this state that a charge does not rise or fall on individual, isolated sentences, but must be looked at as a whole.  This court laid down the test in *State* v. *Ralls,* 167 Conn. 408, 422, 356 A.2d 147 (1974): "The charge to the jury, however, must be read as a whole, and an attempt to assert reversible error by culling a single phrase or inaccurate statement must fail unless it is reasonably probable that the jury were misled.  *State* v. *Tropiano,* 158 Conn. 412, 433, 262 A.2d 147, cert. denied, 398 U.S. 949,

their obvious common interest and values.  This is relevant evidence which had a direct bearing on the credibility of these witnesses."

Later the court also instructed:

"In this matter of credibility, for example, you may consider the testimony of Mr. Turcio, Sr., in which he conceded, during cross-examination, to having given prior erroneous, inconsistent testimony, at a pretrial hearing.  I instruct you that it is all proper for you, as jurors, to determine credibility upon these terms.

"You will recall again, in determining fact from evidence offered to you in court, that it was disclosed that the witnesses, Mr. Turcio, Sr., and Mr. David Leary, had been convicted of a serious crime. A witness is not disqualified because of his conviction of crime; but such conviction may be shown for the purpose of affecting his credibility."

[3] In discussing what had a direct bearing on credibility, the court noted that Joseph Turcio, Sr., made prior inconsistent statements and had a felony conviction; that Robert Torres and David Leary were long-term friends of the defendant; and that Leary had a felony conviction.

90 S. Ct. 1866, 26 L. Ed. 2d 288; *Penna* v. *Esposito*, 154 Conn. 212, 215, 224 A.2d 536; *Allard* v. *Hartford*, 151 Conn. 284, 292, 197 A.2d 69." The charge in the instant case was well balanced. Prior to giving the complained of charge on "particular care," the court gave the following instruction on how to determine the credibility of all the witnesses: "In weighing the testimony of a witness, you should consider his appearance on the stand; you should try to size him up; you should have in mind all those little circumstances which point to his truthfulness or untruthfulness; you should consider any possible bias or prejudice he may have, whether for or against the state or the accused; his interest or lack of interest, of whatever sort, in the outcome of the trial . . . you should test the evidence he gives you by your own knowledge of human nature, and of the motives which influence and control human beings." Moreover, the charge contained the customary reference to the presumption of innocence and the burden on the state to prove all the elements of the offense beyond a reasonable doubt before they could convict. Taken as a totality, it is obvious that the charge accurately and adequately presented the law to the jury. *State* v. *Roy*, 173 Conn. 35, 40, 376 A.2d 391 (1977); *State* v. *Crawford*, 172 Conn. 65, 69, 372 A.2d 154 (1976); *State* v. *Mullings*, 166 Conn. 268, 275, 348 A.2d 645 (1974). In light of the fact that the jury had already been instructed that in weighing the credibility of all witnesses they could consider the ordinary factors that might affect recollection or produce bias, the additional instruction was inappropriate and should be discouraged. When viewed as a whole, however, the charge did nothing more than state to the jury what good common sense dictates; namely, that they

may weigh on the credibility scale the potential for bias where a witness has some relationship with a party to an action.

## II

The defendant's second assignment of error is that the trial court erred in allowing the defendant's father to be cross-examined as to other crimes and bad acts committed by the defendant. On direct examination, the defendant's father was asked about and gave his opinion as to his son's propensity for violent conduct. On cross-examination, the prosecution questioned the father about his knowledge of specific incidents in which his son was involved. On this appeal, the defendant claims that this cross-examination should have been excluded for two reasons: (1) a portion of the examination violated this court's holding in State v. Martin, 170 Conn. 161, 365 A.2d 104 (1976), that a character witness cannot be cross-examined as to specific acts of misconduct in detail to disprove the trait in question; and (2) other portions of the objected-to examination were not relevant to rebut the claim of nonviolence.

The following is a synopsis of the testimony in issue. In support of the intoxication defense, the defendant's father took the stand and testified about his son's problems with drugs and his intoxicated condition on March 5, 1975. During his direct testimony, Joseph Turcio, Sr., was asked by defense counsel to render an opinion as to his son's propensity for violence. Before Turcio responded, the prosecutor objected on the grounds that the question was irrelevant. In the ensuing colloquy, the prosecution indicated that it felt that this question was placing the defendant's character into issue. In

response, defense counsel claimed that the question went to establishing whether the defendant had as a "trait" the tendency to commit violent acts. Turcio then testified that his son was a calm boy and that he had "never seen him act violently."

On cross-examination of Turcio, the prosecution delved into the issue of the defendant's character and tendency to nonviolence as follows: Turcio was asked if he knew that his son "pushed your wife around and was somewhat belligerent and physical with her on July 25th of 1974." Turcio's answer was that he was not aware of the incident. The prosecution then asked whether Turcio knew that his son struggled with the police when they responded to the incident and that the police had to subdue him. Turcio responded that he was not aware of the incident. The prosecution also asked Turcio whether he and his son had a fistfight in August of 1974. Turcio's response was that he remembered the incident, but he explained that no blows had been exchanged. The prosecution next asked Turcio whether he knew that his son had created a disturbance at the East Haven Middle School in March of 1973. Turcio answered that he did not know of the incident. Turcio was then asked whether he knew that his son in June of 1973 had thrown a firecracker out of a car at a police officer. Turcio's reply was that he was aware that his son had thrown a firecracker in front of the police station, but he was not aware it was at a police officer.

From the form and content of the questions excerpted above, it is obvious that the purpose of the cross-examination in the present case was not to prove that certain acts occurred, and thereby disprove a trait of character, but to test the witness'

concept of the character trait, the extent of his observations, and the good faith with which he testified. It is also obvious from the phrasing "did you know" and "do you recall" that the prosecution wanted to test the basis of the witness' opinion, not to disprove the existence of the trait by proof of specific facts. The questions themselves contained no more detail than was necessary to apprise the witness of the specific incidents to which the prosecution was referring and did not require the witness to go into prejudicial detail in his answers.

Whether the accused produces testimony of reputation or opinion to prove a trait, the prosecution may not use specific acts of misconduct to disprove the trait. See *Verdi* v. *Donahue*, 91 Conn. 448, 454, 99 A. 1041 (1917), for the rationale of this rule. "There is a distinction between the prosecution's use of specific acts in rebuttal to disprove the trait in question and the prosecution's use of specific acts in the cross-examination of a character witness. When a character witness has given his opinion as to a particular trait, the state may cross-examine that witness concerning specific acts, not to prove the truth of such facts, but to test the credibility of the character witness by ascertaining his good faith, his source and amount of information and his accuracy. See *Michelson* v. *United States*, [335 U.S. 469, 69 S. Ct. 213, 93 L. Ed. 168]; *United States* v. *Curry*, 512 F.2d 1299, 1305 (4th Cir.), cert. denied, 423 U.S. 832, 96 S. Ct. 55, 46 L. Ed. 2d 50; *United States* v. *Beno*, 324 F.2d 582, 588 (2d Cir.), cert. denied, 379 U.S. 880, 85 S. Ct. 147, 13 L. Ed. 2d 86; and see cases cited in annotation, 47 A.L.R.2d 1258, 1274–77. The question should not be extended to the details of the acts. See *Magee* v. *State,* 198 Miss. 642, 650, 22 So. 2d 245; *State* v. *Carroll,* 188 S.W.2d

22, 24 (Mo.) ; *Schroeder* v. *State*, 142 Tex. Crim. 443, 447, 154 S.W.2d 480. When, on cross-examination, questions as to specific acts are asked for that purpose, they are not objectionable." *State* v. *Martin*, 170 Conn. 161, 164–65, 365 A.2d 104 (1976).

As noted above, the defendant also objects to the prosecution's inquiries about the East Haven school disturbance and the throwing of the firecracker on the ground that those specific incidents were irrelevant to the issue of the defendant's propensity for violence. Defense counsel made a timely objection for the same reasons, but the trial court overruled the objection.

"Evidence of an accused's trait of character must be relevant to an element of the crime charged. *State* v. *Blake,* 157 Conn. 99, 104, 249 A.2d 232; *State* v. *Campbell,* 93 Conn. 3, 10, 104 A. 653. Likewise, when the prosecutor attacks the basis of the witness' opinion by questioning him as to his knowledge of specific acts, such acts must be relevant to those traits. See *Aaron* v. *United States,* 397 F.2d 584, 585 (5th Cir.) ; *People* v. *Marsh,* 58 Cal. 2d 732, 745, 376 P.2d 300. The determination of relevance must be made according to reason and judicial experience. *Robinson* v. *Faulkner,* 163 Conn. 365, 371, 306 A.2d 857. . . . 'In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done.' *State* v. *Brown,* 169 Conn. 692, 702, 364 A.2d 186. '[T]he ultimate issue is whether the court could reasonably conclude as it did.' *DiPalma* v. *Wiesen,* 163 Conn. 293, 299, 303 A.2d 709." *State* v. *Martin,* supra, 165–66.

The defendant's father asserted on direct examination that the defendant was a "calm boy." We cannot say that the trial court abused its discretion by deeming relevant the incidents of the school disturbance and the throwing of the firecracker, which refute the claim of a calm disposition. As to the prejudicial effect of the testimony, the trial judge, in the exercise of judicial discretion, must decide whether the probative value of the testimony outweighs the prejudice likely to result from its admission. *State* v. *Ralls,* 167 Conn. 408, 417, 356 A.2d 147 (1974); *State* v. *Moynahan,* 164 Conn. 560, 597, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219 (1973). The defendant put his character into evidence through his father's testimony as to his opinion of his son's propensity for violence. The trial court did not err in allowing the state to question the basis of Turcio's opinion by referring to specific acts of the accused. The inquiry was relevant to traits in issue and the prosecution went into no more detail than was necessary to delineate and describe the incidents.

### III

The defendant's third assignment of error is that the court improperly admitted into evidence testimony pertaining to certain specific acts of prior misconduct and crimes allegedly committed by the defendant. The defendant specifically objects to five separate incidents: (1) the state's introduction of testimony in its case in chief that on the day of the murder, March 5, 1975, the defendant burglarized a home and was found in possession of the fruits of that burglary later that day; (2) the state's introduction during the course of its cross-examination of the defendant's mother of an appearance bond

form which indicated that the defendant had been arrested for trespassing on March 3, 1975; (3) in rebuttal, the state's presentation of more evidence concerning the defendant's arrest for trespass and the introduction of testimony that in the course and apprehension of the defendant and a companion, Robert Torres, shotgun shells were found on both of them; (4) the state's presentation of evidence in rebuttal that a policeman observed and followed the defendant on March 4, 1975, at 2:30 a.m.; and (5) the state's offer of evidence that on September 19, 1974, an East Haven police officer fingerprinted the defendant.

As a general proposition, evidence of guilt of other crimes, because of its prejudicial nature, is inadmissible to prove that a defendant is guilty of the crimes with which he is charged. *State* v. *Holliday,* 159 Conn. 169, 172, 268 A.2d 368 (1970); *State* v. *Harris,* 147 Conn. 589, 599, 164 A.2d 399 (1960). Such evidence is admissible for other purposes, however, such as when it is particularly probative in showing such things as intent, an element in the crime, identity, malice, motive or a system of criminal activity, to name some exceptions to the rule. *State* v. *Brown,* 169 Conn. 692, 701, 364 A.2d 186 (1975). The trial judge, however, must determine in the exercise of judicial discretion that its probative value outweighs its prejudical tendency. *State* v. *Moynahan,* supra, 597; *State* v. *Holliday,* supra, 173. Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done. *State* v. *Hauck,* 172 Conn. 140, 144, 374 A.2d 150 (1976); *Thomas* v. *Thomas,* 159 Conn. 477, 480, 271 A.2d 62 (1970); 1 Wharton, Criminal Evidence (13th Ed.) § 241.

The testimony to which the defendant has assigned error concerning the burglary was given by three witnesses, Domenic DeLucia, James Arcangelo and Anthony DeLucia, called by the state in presenting its case in chief.[4] The sum and substance of their testimony was as follows: Domenic DeLucia took the stand and testified on direct that between 9 and 9:30 p.m. on March 5, 1975, the day of the assault on the Massaros, he was a passenger in a car being driven by his cousin, James Arcangelo. DeLucia saw the defendant hitchhiking on route 80 in East Haven and Arcangelo stopped the car and they talked with him. While they were talking, DeLucia noticed that the defendant had in his possession DeLucia's wristwatch and his sister's ring. DeLucia then told the defendant to get into the car and, when the defendant resisted, the two exchanged punches. The trio then drove directly to DeLucia's home and DeLucia called the police because he believed that the defendant had robbed his house earlier that day. According to DeLucia, the defendant denied breaking into his house. The defendant also told him that the items taken from DeLucia's house between 10 and 11 a.m. were at David Leary's house.

DeLucia further testified that the police arrived at the house five or ten minutes after they were called. The police placed the defendant in custody and left. DeLucia saw other items on the defendant that were taken in the burglary including a cross, silver coins and rings. DeLucia did not see a gun on the defendant when he picked him up. On the

[4] The burglary itself is relevant because the defendant was brought to the police station initially in connection with it. It was while being questioned about the burglary at the DeLucia residence that he admitted shooting the Massaros.

stand, DeLucia identified a wallet that was stolen from his house. He stated that he saw the wallet on March 5, 1975, when it was taken out of the defendant's pocket. DeLucia also testified that while the defendant was with him he looked tired, but there was nothing unusual about him, that he understood everything the defendant said and that the defendant was not staggering or acting abnormally.

Immediately after DeLucia testified, the trial court at the request of the defendant gave an instruction on DeLucia's testimony, cautioning the jury that his testimony could be considered only for the limited purpose of explaining the confrontation.

James Arcangelo testified generally to the same effect. He also testified that although the defendant appeared tired, he seemed to know where he was. He had no difficulty walking, spoke clearly and his appearance was not unusual. No cautionary instruction was requested or given.

Anthony DeLucia, Domenic's father, testified that he was home when the defendant and his son and Arcangelo arrived shortly after 9 p.m. He asked the defendant if he had broken into the house and the defendant said no. He further testified that the defendant told his son: "I wouldn't rip you off, Domenic. If you want your stuff, I can take you right now. It's at Dave's."

On direct examination, the prosecution did not ask Anthony DeLucia about the defendant's physical condition. No limiting instruction was requested or given.

Before these witnesses were called, defense counsel objected to their testifying on the ground that the prior crime evidence he expected to be elicited would

be prejudicial and lacked probative value; that evidence of a burglary which occurred between 10 and 11 a.m. was irrelevant to establish the defendant's state of mind at 8 p.m. the same day; that there were no witnesses to the burglary; and that the only link between it and the defendant was the fact that he had some of the stolen items in his possession. The prosecution claimed the testimony was relevant and thus admissible on two grounds: first, to negate the claim that the defendant's confession was involuntary because of his intoxicated condition and, secondly, to negate the defendant's anticipated defense that he lacked the intent to commit the crime because of his intoxicated state.

In the instant case, the defense was lack of specific intent to commit the crimes charged by reason of intoxication due to drug ingestion. In order to prove intent, an essential element of the crimes charged, the prosecution had the burden of disproving intoxication. To this end, testimony as to the defendant's demeanor, his ability to understand, his physical appearance, and his speech patterns, offered by individuals who observed and interacted with him a little less than an hour after the shootings, would be highly probative and relevant on the issue of intent. The testimony as to prior crimes was necessary background to explain how and why the defendant was in the presence of those three witnesses shortly after the shootings and as a basis for the admissions to the police which were to follow. See State v. Harris, 147 Conn. 589, 599, 606, 164 A.2d 399 (1960).

While it was not an abuse of the trial court's discretion to allow the testimony as to the morning burglary, because of its relevancy to intent and the

issue of drug intoxication or lack of the same and its significance in establishing a context, it is important to note also that the same evidence was elicited later without objection from the arresting officer in testifying as to the voluntariness of the defendant's subsequent admissions while in custody. Further, after the inital testimony by DeLucia, the court gave a limiting instruction which correctly instructed the jury on its proper use.

## IV

The defendant next attacks the court's allowance into evidence of an appearance bond form signed by the defendant two days before the shootings. The appearance bond in question contained the defendant's signature and indicated that he had been arrested for criminal trespass on March 3, 1975.

The context of the complained of error is as follows: During its case in chief, the prosecution introduced two *Miranda* warning cards without objection and a fingerprint card, all of which were offered solely to show the voluntary nature of the statements made by the defendant in police custody. Defense counsel objected to the admission of the fingerprint card on the ground of lack of relevancy, but the objection was overruled.

To support its claim that the defendant was so intoxicated by drugs that he lacked the required intent to commit the crimes charged, the defense called the defendant's mother, Jeanette Turcio, who was familiar with the defendant's handwriting, and questioned her about her son's handwriting on various exhibits. During cross-examination of Mrs. Turcio, the prosecution offered the appearance bond

in question. Defense counsel objected to the admission of the bond on the grounds that it was evidence of a prior arrest and it had no probative value that outweighed its prejudical effect.

The state argued that the appearance bond was relevant to the issue of the defendant's mental ability or state of mind at the time it was signed. The court ruled that the offer of other comparative signatures was the operative condition for its admission; that it was relevant evidence to the issue of the defendant's ability to form intent; and that its probative value outweighed the prejudical context. The court noted that there was no way to excise the prejudicial parts of the form. Defense counsel made no suggestion on how to disguise the nature of the document at that time, except for exclusion.

On appeal, the defendant contends that he was prejudiced because the appearance bond form and the testimony surrounding its admission tended to prove the commission of other crimes than that charged and unconnected with the case being tried. The defendant argues that the appearance bond form is similar to a mug shot and fingerprint card and therefore its admissibility should be dependent on the same criteria as that enunciated in *United States* v. *Harrington,* 490 F.2d 487 (2d Cir. 1973). Since *Harrington* was decided, this court has considered the effect of mug shots in evidence in at least four cases and has consistently followed the rule regarding any evidence which indicates prior criminal activity. In determining admissibility the trial court must consider whether such evidence is relevant and, if so, whether its probative value outweighs its prejudicial effect. See *State* v. *Peary,*

176 Conn. 170, 175–76, 405 A.2d 626 (1978); *State* v. *Crowe,* 174 Conn. 129, 131, 384 A.2d 340 (1977); *State* v. *Robertson,* 172 Conn. 9, 372 A.2d 128 (1976); *State* v. *Woods,* 171 Conn. 610, 370 A.2d 1080 (1976).

The defense raised by the defendant was that he lacked specific intent to commit the crimes charged due to intoxication. Evidence was introduced by the defense that the defendant had been "high" daily for two weeks up to and including the day of the shootings. There also was testimony that the defendant had taken the same amount and type of drugs on March 3, 1975, the day he was arrested for criminal trespass, as he took on the day of the shootings, March 5, 1975. In an attempt to prove that the defendant was intoxicated with drugs on the evening of March 5, 1975, the defense introduced a photostatic copy of the defendant's bankbook and his social security card with his signature. Mrs. Turcio identified the signatures on these items as the defendant's. She was then presented with two *Miranda* cards, which had previously been introduced by the prosecution for another purpose, signed by the defendant the night of the killings, and was asked to identify the signatures. She testified that the signatures on the *Miranda* cards did not look like her son's writing. In response to this testimony, the prosecution introduced the appearance bond which had been signed two days before the shootings and asked Mrs. Turcio to identify the signature. Other samples of the defendant's handwriting were in evidence. Some were offered by the defense; others by the prosecution. The appearance bond, however, was the only other sample offered that was made by the defendant when he was supposedly "high." Thus, it was the only evidence avail-

able to contradict or at least to question the defendant's claim that his signature on the two *Miranda* warning cards indicated his intoxicated state.

It cannot be argued that the signature which was written only two days earlier was not relevant in view of the testimony of the defendant's mother concerning the appearance of his signature on the items signed shortly after the shootings, when the defendant was supposedly "high."

The argument that the evidence that the defendant was arrested for trespassing and was roaming the streets late at night shortly before the shootings could influence the jury in the determination of whether he committed the crimes charged loses its force since it is admitted that the state had a "strong" case against the defendant concerning the shootings. The real issue was whether he was intoxicated by drugs at the time as claimed by the defendant himself. In this context, it cannot be found as a matter of law that the court was in error in its finding that the probative value of this evidence outweighed its prejudical effect. It is also noted that the court gave a cautionary instruction to the jury which in no way focused the jury's attention on the source or nature of the document.

## V

The defendant has further assigned as error the trial court's refusal to exclude Officer George Silk's testimony relating to a prior arrest and misconduct and the defendant's possession of a shotgun shell. In its rebuttal case, the state called Officer Silk, who testified that he had arrested the defendant and Robert Torres, who had previously testified as a

witness, on the night of March 3, 1975, for criminal trespass. The prosecution asked Officer Silk whether Torres and the defendant were searched. The officer responded affirmatively and the prosecution asked what was found on Torres. Silk testified that he found two shotgun shells on Torres and one .12 gauge shotgun shell on the defendant. He also testified in response to a question as to the defendant's appearance at that time that the defendant's eyes appeared "bloodshot, reddish, sort of glassy," but that he had no trouble understanding him, his speech was not slurred and he was not staggering. The officer further testified that he observed the defendant the next morning, March 4, 1975, around 2:30 a.m., and he stopped him and questioned him. Officer Silk also responded that at that time the defendant did not seem to have any difficulty moving and he had no speech defects. Officer Silk also observed that his eyes did not appear glassy or red and that the defendant appeared to understand everything Officer Silk said.

Prior to Officer Silk's testimony about the March 3 arrest, defense counsel asked that the jury be excused and he objected on the ground that it was testimony as to prior crimes and its prejudicial effect outweighed its probative value. The state argued that there was no error in admitting the testimony because it went to establishing the defendant's physical condition and state of mind which were the central issues in the trial, and because the fact of the arrest had already been brought out through Mr. Turcio, Sr.'s testimony, Torres' testimony and the introduction of the appearance bond. The state contended that the testimony about the defendant's possession of the shotgun shell was relevant to proving he had access to his uncle's house

and gun collection from which the murder weapon was taken. The court, after the state made its offer of proof, overruled the defendant's objections and allowed Officer Silk to testify as noted above.

The defendant has really raised together two separate claims of error here. They will be addressed separately.

The law as to testimony of prior crimes and misconduct discussed above is applicable to testimony here regarding the criminal trespass arrest and the March 4 nightwalking incident when he was stopped by Officer Silk. In balancing the relevancy and probative value of the testimony against its prejudicial effect; *State* v. *Ralls,* 167 Conn. 408, 417, 356 A.2d 147 (1974); we find that the trial court was not in error in admitting it. The testimony about the arrest for criminal trespass served only as a predicate upon which to base Officer Silk's testimony about his observations of the defendant's physical and mental condition on both the night of March 3, 1975, and again the following morning of March 4, 1975. The defendant had based his defense on the claim that he was intoxicated through drug ingestion when he shot the Massaros on March 5, 1975, and that he had been "high" for the immediately preceding few days. He had interjected the issue of his mental and physical state into the trial through his own testimony, through that of his parents and through the testimony of Robert Torres and David Leary. Thus, Officer Silk's testimony, which described the defendant's physical state within forty-eight hours of the shooting, was relevant to intent, an element of the crime at issue. *State* v. *Moye,* 177 Conn. 487, 493, 418 A.2d 870 (1979); *State* v. *Schaffer,* 168 Conn. 309, 317, 362 A.2d 893 (1975).

Officer Silk had been able to observe the defendant twice during this self-proclaimed "high" period. The relevance of this evidence to disproving the central claim advanced by the defendant is obvious, and, clearly, the necessity and probative value of it outweighs any prejudicial impact that an arrest for trespass might have had on the jury. The same is true of the nightwalking incident on March 4. It was offered not to show that the defendant was a bad person, but to contradict the testimony put forth by the defendant's witnesses that he was "high" at the time of the shootings and for a period of days preceding them. It bears reiterating that the issue of intoxication by drugs was the central issue in the case. Therefore, the testimony was relevant and probative and the trial court did not abuse its discretion in allowing it. Moreover, after Officer Silk concluded his testimony, the court gave a cautionary instruction as to evidence of other crimes.

The defendant claims that the testimony about the shotgun shells presents an entirely different aspect of the question of the admissibility of evidence pertaining to prior crimes and misconduct. He directs our attention to this court's recent ruling in *State* v. *Acklin,* 171 Conn. 105, 368 A.2d 212 (1976). There is a fundamental difference between *Acklin* and the case at bar. In *Acklin,* the evidence concerning the defendant's possession of ropes and masks went to the heart of the crimes charged—robbery and conspiracy to commit robbery. Moreover, the prosecution proffered them for the express purpose of proving the conspiracy charge. In the present case, it was established that the shootings were done with a .32 caliber pistol, not the shotgun from which the shells were taken. According to the state, the testimony was offered to suggest that the defendant had

possible access to the murder weapon; not a critical element, since the essential issue in the trial was not whether the defendant shot the victims, which he admitted, but whether he had the physical and mental capacity to form the necessary intent.

The instant case is also distinguishable from *State* v. *Johnson,* 160 Conn. 28, 273 A.2d 702 (1970), on which Acklin was based. As with *Acklin,* the testimony in *Johnson* went directly to establishing a critical and disputed issue in the case—the defendants' access to the dynamite—the means of committing the crime. The state never "connected" the defendants with the dynamite seized. In *State* v. *Ferraro,* 160 Conn. 42, 273 A.2d 694 (1970), this court followed *Johnson,* supra, and remanded for a new trial in a situation where the state offered evidence as to the defendants' possession of guns and ammunition after an armed robbery, but never tied the guns and ammunition in question to the crime with which the defendants were charged. The instant case is distinguishable from the above cases because the testimony was not presented to establish a critical element of the crime, i.e., possession of the instrumentality to commit the crime. Despite this fact, however, it was error to admit the shotgun shell testimony as its claimed relevancy was too remote. The error was harmless, however; see *State* v. *Ralls,* 167 Conn. 408, 417, 356 A.2d 147 (1974); for several reasons: (1) there was no suggestion that the shell came from the murder weapon; (2) possession of a shotgun shell is not a criminal act; (3) possession of a shotgun shell per se is not the type of activity that elicits fear and prejudice from a jury; and (4) there was overwhelming evidence of his guilt. See *State* v. *Williams,* 170 Conn. 618, 634, 368 A.2d 140 (1976).

## VI

The defendant next assigns as error the trial court's refusal to grant a mistrial as the result of Officer Nicholas Bencivengo's testimony which the defendant claims prejudicially suggested prior criminal misconduct on the defendant's part. The objected-to testimony, which was ultimately stricken, is as follows: After indicating that he knew the defendant and identifying him, Officer Bencivengo testified:

"Q. [Mr. John T. Redway] Did you have occasion to see him on September 19th of 1974?

A. [Officer Bencivengo] Yes, I did.

Q. Did he have occasion to affix his signature to a document in your presence on that particular day?

A. Yes, he did.

Q. At my request, did you bring a photocopy of that document here today?

A. Yes.

Q. May I see it?

A. (Indicating).

Q. How do you know—how do you recognize that document?

A. I make it a practice on fingerprint cards—I make a practice of putting an X where the accused has to sign his signature.

Q. And is your signature on there also?

A. Yes, it is.

Q. Can you recognize your signature as well?

A. Yes, sir.

Mr. Redway: I'll offer this, your Honor.

Mr. [Barry B.] Johnson: I'm going to ask that the jury be excused again."

The defendant contends on appeal, as he did in the trial court, that Officer Bencivengo's unsolicited reference to "fingerprint cards," set against the background of all the previously admitted other prior crimes testimony, raised the specter of prior criminal misconduct and "infected" the jury to the extent that neither the curative instructions given by the court nor its order to strike the testimony was sufficient to remove the taint. The question of whether the court erred in denying the defendant's motion for a mistrial must, then, focus on Officer Benvicengo's remark in the context of the curative instruction and the granting of the motion to strike. Right after the remark about fingerprint cards, defense counsel asked that the jury be excused and requested a mistrial. The motion for a mistrial was denied, although the court sustained the defendant's objection to the testimony itself. At this point the jury were recalled, and the court in their presence ordered the question and Benvicengo's answer struck. Then the court gave the following curative instructions to the jury: "In your absence, ladies and gentlemen, I have sustained an objection to the testimony the witness Bencivengo was about to offer for your consideration. That was the witness' sole prospective evidential value to you, and he has been withdrawn from the witness stand. The court instructs you to disregard his testimony insofar as his responses may have suggested to you an accusation of crime by the defendant for which he

is not charged here. Any such consideration is improper and is not before you and you are instructed to disregard it."

The general principle is that a mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial. *State* v. *Peary,* 176 Conn. 170, 172–73, 405 A.2d 626 (1978); *State* v. *Ruiz,* 171 Conn. 264, 368 A.2d 222 (1976); *State* v. *Brown,* 169 Conn. 692, 703, 364 A.2d 186 (1975); *State* v. *Rose,* 168 Conn. 623, 635, 362 A.2d 813 (1975). The court has a wide discretion in passing on motions for mistrial. *State* v. *Ruiz,* supra; *State* v. *Rose,* supra; *State* v. *Savage,* 161 Conn. 445, 449, 290 A.2d 221 (1971). In light of the fact that the answer was unresponsive,[5] the fingerprint card was never placed before the jury or admitted into evidence,[6] there was no evidence that the fingerprint card was obtained in conjunction with an arrest rather than with a job; see *State* v. *Ralls,* 167 Conn. 408, 418, 356 A.2d 147 (1974); and the trial court granted the motion to strike and immediately gave the above mentioned curative instruction to the jury, we hold that the trial court properly concluded that there was nothing in the witness' answer which could not be cured by its being stricken and by the instructions to the jury to disregard it. Therefore, it cannot be found

[5] It is important to note that we are concerned here not with the admission into evidence of a fingerprint record containing incompetent extraneous material; see *State* v. *Ralls,* 167 Conn. 408, 417–18, 356 A.2d 147 (1974); but testimony about a document containing the defendant's signature, which unresponsively was identified as a "fingerprint card."

[6] In questioning the witness, the prosecutor had referred only to a "document" and had not solicited any evidence from Officer Bencivengo about criminal activity on the defendant's part.

that the trial court abused its discretion in not declaring a mistrial. *State* v. *Ruiz*, supra, 274; *State* v. *Brown*, supra, 703.

## VII

The defendant's final assignment of error is that the trial court erred in not suppressing his confession and other statements made after his apprehension because a minor cannot effectively waive a constitutional right without parental advice.[7] In his argument, the defendant candidly admits that he is asking this court to adopt a per se rule that accused individuals under the age of eighteen cannot effectively waive their constitutional rights with respect to self-incrimination, to effective assistance of counsel and to due process of law unless advised by a parent or guardian. We are not persuaded by the defendant's arguments or his interpretation of the rulings of the Supreme Courts of Pennsylvania and Indiana.[8] Instead, we again reaffirm the test laid down in *State* v. *Oliver*, 160 Conn. 85, 94, 273 A.2d 867 (1970), cert. denied, 402 U.S. 946, 91 S. Ct. 1637, 29 L. Ed. 2d 115 (1971) : "There is nothing in our law which disqualifies a minor simply because of age from effectively waiving his rights and confessing as the defendant did. It is the totality of the circumstances of the waiver and confession rather than only the age of the defendant which determines whether a waiver of *Miranda* specified rights is valid and effective. 'We cannot accept the suggestion that every minor is as a matter of law incompetent to waive his constitutional rights to remain silent and

[7] Although not raised at the trial level in this form, we are considering this claim because of its constitutional dimensions. *State* v. *Evans*, 165 Conn. 61, 70, 327 A.2d 576 (1973).

[8] *Commonwealth* v. *Smith*, 472 Pa. 492, 372 A.2d 797 (1977), and *Lewis* v. *State*, 259 Ind. 431, 288 N.E.2d 138 (1972).

to an attorney unless the waiver is consented to by a parent or guardian who has himself been advised of the minor's rights. Of course, such adult consent is to be desired. However, whether a minor knowingly and intelligently waived these rights is a question of fact and a mere failure of the police to seek the additional consent of an adult will not outweigh, in any given instance, an evidentially supported finding that such a waiver was actually made.' "

There is no error.

In this opinion the other judges concurred.