We conclude that the state of Connecticut acquired jurisdiction over crimes committed on the Mashantucket Pequot Indian Reservation by the enactment of § 1755 of title 25 of the United States Code.

STATE OF CONNECTICUT *v.* FREDERICK CONN
(15109)

PETERS, C. J., and CALLAHAN, BERDON, NORCOTT and PALMER, Js.

Argued March 22—decision released July 4, 1995

*Vicki H. Hutchinson*, special public defender, with whom was *Rita Van Item*, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, assistant state's attorney, with whom, on the brief, were *Walter D. Flanagan*, state's attorney, and *David Holzbach*, assistant state's attorney, for the appellee (state).

CALLAHAN, J. The defendant, Frederick Conn, was convicted after a jury trial of felony murder in violation of General Statutes § 53a-54c.[1] In the information

---

[1] General Statutes § 53a-54c provides: "FELONY MURDER. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom,

filed against the defendant, the state alleged that the defendant, acting either alone or with Bassell Conn and/or Enrique Smith, "attempted to commit the crime of Robbery and in the course of and in furtherance of such crime or flight therefrom he or another of the participants . . . caused the death of one Michael Samaha." The defendant claims on appeal that: (1) the state destroyed potentially exculpatory evidence, in violation of his right to due process of law under the fourteenth amendment to the United States constitution, by failing to test, in a timely manner, certain physical evidence; (2) the trial court improperly denied his motion to unseal his arrest warrant and its supporting affidavit prior to his probable cause hearing; and (3) the trial court improperly failed to instruct the jury that it could draw an adverse inference against the state for failure to test the physical evidence.[2] We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On September 10, 1992, shortly after 10 p.m., Robert Arconti, a patrol officer with the Danbury police department, found the victim lying in the alley between 112 and 114 Elm Street in Danbury with a single gunshot wound to his lower back. The victim was on his left side, unconscious, with his left arm under his body

he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (1) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (2) was not armed with a deadly weapon, or any dangerous instrument; and (3) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (4) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

[2] The constitutional issue concerning the prohibition of discovery by General Statutes § 54-46a discussed in the concurring opinion was not raised, briefed or argued by the defendant.

and his pants pulled down exposing most of his buttocks. As the emergency medical technicians who had been called to the scene were moving the victim to the ambulance, a twenty dollar bill fell from the victim's left hand. Arconti gave the bill to officer Roger Brooks, the evidence technician responsible for photographing and collecting evidence at the scene. The victim died on the operating table at Danbury Hospital early the next morning. The cause of death was determined to be the "penetrating injury caused by the bullet that entered through his back into and traversed his abdominal cavity injuring the aorta as well as the intestinal tract."

Brooks recovered several items in addition to the twenty dollar bill that had fallen from the victim's hand. A .32 caliber, semiautomatic Beretta pistol, that was loaded and cocked, with a round in the chamber, was found in the rear of the alley. Moreover, in addition to the bullet removed from the victim's body, a second bullet was retrieved from the wall behind the victim and two shell casings were discovered within twelve feet of where the victim had fallen. A light colored T-shirt and a dark colored baseball cap also were located in the alley near a fence.

In addition, the jury heard the following testimony that it could have credited. Mark Trohalis, the Danbury police officer who had found the T-shirt and baseball cap in the alley, testified at trial that these items were "very dry and that night it had rained off and on, sometimes very heavily . . . . It's very common when you have a crime occurring that people will try to change their appearance to avoid being caught and this was a very real possibility." Edward McPhillips, a firearms examiner for the state police forensic laboratory, testified at trial that, from the results of the ballistic tests that he had conducted on the pistol recovered from the scene, the bullet that had been removed from the vic-

tim's body had been discharged from the pistol found at the rear of the alley and that the two shell casings found had been fired from the same gun.[3]

Friends of the defendant, Ezra Staton, Terrel Staton and Timothy Mourning, testified that, approximately one week before the shooting, they had seen the defendant and his brother, Bassell Conn, in possession of a black .32 caliber pistol that the brothers kept in a black waist pouch. Furthermore, Vandy Heard, Michael Ross, Terrel Staton and Mourning testified that shortly before they heard gunshots from the alley, they had been standing in a group at a corner near the alley and had seen the defendant, his brother and Smith with the pistol.

Ross testified that, while the group was gathered at the corner, he had seen the defendant's brother take the gun out of the pouch and wave it in the air. Ross further testified that about ten or fifteen minutes later, when he was at the basketball courts not far from the alley, he had heard two gunshots from the direction of the alley. Heard testified that the group, including the Conn brothers and Smith, had gathered at the corner near the alley and were discussing the possibility of robbing someone when the defendant's brother took the gun out of a black waist pouch. Because it had started to rain, the group then disbanded, except for the defendant, his brother and Smith. Both Heard and Terrel Staton testified that when they saw the defendant and his brother just prior to the shooting, Bassell was wearing a black baseball cap.

There were two eyewitnesses to the shooting. Elisha Council testified that she had been in the alley with the

---

[3] McPhillips was unable to determine whether the bullet that had been retrieved from the wall behind where the victim had fallen was fired from the same weapon because the condition of the bullet prevented him from making a positive identification.

victim shortly before he was shot. The victim asked Council if she could find someone either to sell him some drugs or to have sex with him. Thereafter, Council left the victim and went to the back porch of a building overlooking the alley. While on the back porch, she heard a commotion. She testified that she saw three men, in addition to the victim, in the alley and that two of them had attacked the victim and asked him for money while the third appeared to act as a lookout. Council then heard two gunshots, but was not certain who shot the victim. The three men then fled. Council identified the three perpetrators as the defendant, his brother Bassell and Smith.

At the time of the shooting, another eyewitness, Theresa Perkins, was in her second floor apartment, which is adjacent to the alley. She testified that when she heard a commotion, she looked out of her window and saw the victim being attacked by two men. She then heard a gunshot and saw the victim fall to the ground, but could see only that the shooter had on "a T-shirt with a logo on it and a dark-color hat," and could not discern the shooter's identity. She did, however, identify the defendant as one of the individuals involved in the attack.

Mourning gave a statement to the police on September 13, 1992, which was read to the jury and admitted into evidence for substantive purposes, stating that shortly after the shooting, "Boz Conn came up to me and said, 'I just shot somebody.'" Cedric Jones testified that two days after the shooting, the defendant had told him that the defendant, the defendant's brother and Smith had shot someone in the alley. Jones further testified that the defendant had asked him to act as an alibi witness by stating that they were together at the mall at the time of the shooting. Additional facts will be provided as necessary.

# I

We first address the defendant's claim that the state destroyed potentially exculpatory evidence, in violation of his right to due process of law under the fourteenth amendment to the United States constitution,[4] by failing to test, in a timely manner, certain physical evidence.

The following facts are relevant to this claim. Brooks, who had collected the evidence at the crime scene, testified that about one week after he had obtained the T-shirt and black baseball cap from the alley, he sent them to the state forensic laboratory and requested that they be processed for hairs, fibers and gunshot residue. Kiti Settachatgul, a lead criminalist in the trace evidence section of the state forensic bureau, first testified on October 13, 1993. He stated that he had found several hairs on the T-shirt and baseball cap. He classified the hairs as "negro." He stated, however, that he did not perform any additional tests with regard to the hairs because no hair samples had been submitted with which he could compare the hairs found on the T-shirt and baseball cap.

Settachatgul also testified that he did not submit his report to the Danbury police department until September 14, 1993, more than one year from the date of the murder, and that the delay was a result of the heavy caseload at the laboratory. Thus, the tests on the evidence were not performed until just before the trial was scheduled to begin and only then because a case that is scheduled for trial takes precedence over others. Set-

---

[4] The fourteenth amendment to the United States constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

tachatgul further testified that on September 10, 1993, he had requested a sample of hair from the defendant, his brother Bassell and Smith from the Danbury police department for comparison with the hair recovered from the T-shirt and baseball cap. No samples were sent to him at that time.

After Settachatgul's testimony on October 13, 1993, the defendant, out of the presence of the jury, in a motion for nontestimonial evidence, requested that hair samples be taken from the defendant to be compared with the hairs found on the T-shirt and baseball cap. The defendant's stated reason for his request was that "I don't want to leave the jury thinking that we refused to comply. We never received any requests for such evidence before, and I don't want to leave that gaping hole or that question mark in the jurors' mind[s]." The state did not object to the motion and stated that its "reason for not requesting this in the first place was because [it had] received the information so late, [and] didn't feel there was sufficient time for the State's motion [for nontestimonial evidence]." Thereafter, hair samples were collected from the defendant, his brother and Smith and sent to the state forensic laboratory for comparison.

On October 21, 1993, Settachatgul was recalled to the stand. He testified that he had collected one hair from the baseball cap and six hairs from the T-shirt recovered from the scene. Settachatgul explained that he had compared the hairs found at the scene and the samples submitted by the defendant, his brother and Smith under a comparison microscope, which enabled him to view both simultaneously. He generally compares the pigment, distribution of pigment and size of the hair and how the hair "behaves" in order to determine whether samples are similar to the hairs found at the crime scene. Settachatgul determined that the

hair samples collected from the defendant, his brother and Smith were not similar to the hairs found on the T-shirt and baseball cap found in the alley.

Settachatgul further testified, however, that he could not determine positively whether the defendant, his brother Bassell or Smith had had contact with the T-shirt or the baseball cap. First, he testified that the hairs found on the T-shirt and cap did not necessarily originate from the person wearing them. Hairs can come from sources other than from the person actually wearing the clothing. Second, although the hair samples recovered from the scene were preserved properly and did not change once they had fallen out of the scalp, a person's head hair may change depending on his diet and environment. He testified that an exact match for pigment of the hair is more likely to be found if the samples are collected within one or two months of the hair to which it is to be compared. Finally, Settachatgul testified that: "It is to be noted microscopical hair comparison do[es] not serve as a positive mean[s] of individualization." That is to say, hair sample comparison is not as distinctive as, for example, fingerprinting as a means of identification, and individuals cannot necessarily be identified by hair samples.

The defendant argues on appeal that "[a]lthough the evidence in [this] case was not lost or destroyed in [the] traditional sense, its usefulness to the defendant was lost or destroyed." The defendant concedes that there was no evidence of bad faith on the part of the police. It is undisputed, moreover, that the T-shirt and baseball cap, as well as the hair recovered from them, were preserved properly. The defendant's claim is that the state's failure to notify him of the existence of the hair recovered from the scene within two months of the murder violated his due process rights under the fed-

eral constitution, because it amounted to a destruction of potentially exculpatory evidence. He makes no claim under the state constitution.[5]

Under the United States constitution, a criminal defendant's due process rights may be violated by the state's failure to provide the defendant with evidence within its control in two situations. The first situation is the withholding of exculpatory evidence from the accused. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the [government]." *Brady* v. *Maryland,* 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *State* v. *Morales,* 232 Conn. 707, 714, 657 A.2d 585 (1995); *State* v. *Walker,* 214 Conn. 122, 126, 571 A.2d 686 (1990); *State* v. *Cohane,* 193 Conn. 474, 495, 479 A.2d 763, cert. denied, 469 U.S. 990, 105 S. Ct. 397, 83 L. Ed. 2d 331 (1984).

The second situation, which is at issue in this case, is the failure of the police to preserve evidence that might be useful to the accused. "The Due Process Clause of the Fourteenth Amendment, as interpreted

---

[5] We recently have considered the issue of police failure to preserve potentially exculpatory evidence under the due process clause of our state constitution. In *State* v. *Morales,* 232 Conn. 707, 726–27, 657 A.2d 585 (1995), we held that a trial court, in determining whether a defendant has been afforded due process of law under the state constitution, must weigh "the reasons for the unavailability of the evidence against the degree of prejudice to the accused. More specifically, the trial court must balance the totality of the circumstances surrounding the missing evidence, including the following factors: 'the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its nonavailability to the defense and the prejudice to the defendant caused by the unavailability of the evidence.' *State* v. *Asherman,* [193 Conn. 695, 724, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985)]." Because the state constitutional claim is not here presented, we decide this case only under the federal constitution and express no opinion as to the outcome under the state standard.

in *Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. . . . *[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.*" (Emphasis added.) *Arizona* v. *Youngblood*, 488 U.S. 51, 57–58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988), reh. denied, 488 U.S. 1051, 109 S. Ct. 885, 102 L. Ed. 2d 1007 (1989).

Because the defendant concedes that there was no bad faith on the part of the police, he has failed to demonstrate a violation of his right to due process of law under the federal constitution. Therefore, even if we credit his claim that the hair evidence functionally was destroyed, the defendant's first claim is without merit.

## II

We next address the defendant's claim that the trial court improperly denied his motion to unseal his arrest warrant and its supporting affidavits prior to his probable cause hearing. The arrest warrant for the defendant was signed on September 15, 1992. Because the investigation was ongoing and because minors were involved, the arrest warrant and its supporting affidavits were sealed pursuant to Practice Book § 593A at the request of the state's attorney.[6] On October 2,

---

[6] Practice Book § 593A provides in relevant part: "At the time the arrest warrant is issued, upon written request of the prosecuting authority and for good cause shown, the judicial authority may order that the supporting affidavits be sealed from public inspection or that disclosure be limited under such terms and conditions as it finds reasonable, subject to the further order of any judicial authority thereafter having jurisdiction of the

1992, the defendant moved to unseal the warrant's supporting affidavits as to defense counsel only. After a hearing on October 26, 1992, the trial court, *Geen, J.*, denied the motion.

A

Before the trial court, the defendant relied on the portion of § 593A that provides: "No such order [to seal the supporting affidavits] shall limit their disclosure to the attorney for the accused . . . ." The trial court, however, determined that the motion to unseal the arrest warrant's supporting affidavits was a motion for discovery, which, pursuant to General Statutes § 54-46a,[7] is not permitted in connection with a proba-

---

matter. *No such order shall limit their disclosure to the attorney for the accused, but the judicial authority may place reasonable restrictions on the attorney's further disclosure of the contents of the affidavits. . . ."* (Emphasis added.)

[7] General Statutes § 54-46a provides: "PROBABLE CAUSE HEARING FOR PERSONS CHARGED WITH CRIMES PUNISHABLE BY DEATH OR LIFE IMPRISONMENT. (a) No person charged by the state, who has not been indicted by a grand jury prior to May 26, 1983, shall be put to plea or held to trial for any crime punishable by death or life imprisonment unless the court at a preliminary hearing determines there is probable cause to believe that the offense charged has been committed and that the accused person has committed it. The accused person may knowingly and voluntarily waive such preliminary hearing to determine probable cause.

"(b) Unless waived by the accused person or extended by the court for good cause shown, such preliminary hearing shall be conducted within sixty days of the filing of the complaint or information in superior court. The court shall be confined to the rules of evidence, except that written reports of expert witnesses shall be admissible in evidence and matters involving chain of custody shall be exempt from such rules. *No motion to suppress or for discovery shall be allowed in connection with such hearing.* The accused person shall have the right to counsel and may attend and, either individually or by counsel, participate in such hearing, present argument to the court, cross-examine witnesses against him and obtain a transcript of the proceedings at his own expense. At the close of the prosecution's case, if the court finds that, based on the evidence presented by the prosecution, probable cause exists, the accused person may make a specific offer of proof, including the names of witnesses who would testify or produce the evidence

ble cause hearing. The trial court concluded that the probable cause hearing replaced the grand jury, and "nobody could get from a prosecutor, before a grand jury came in with an indictment, any affidavits for anything else, and this is the same situation. Instead of using a grand jury, it's now a hearing in probable cause in front of a judge, and the affidavits that are to support the warrants need not be disclosed, just [as] they wouldn't have had to have been disclosed had it been a grand jury of eighteen people."

In the November, 1982 general election, the voters of Connecticut approved a constitutional amendment that abolished the previous constitutional requirement that a grand jury find probable cause before the state could prosecute an individual for crimes punishable by death or life imprisonment. Instead, the 1982 constitutional amendment required that a probable cause hearing be conducted in accordance with the procedures to be promulgated by the legislature. See Conn. Const., amend. XVII; 26 S. Proc., Pt. 4, 1983 Sess., pp. 1413–14, remarks of Senator Howard T. Owens, Jr. Section 54-46a, enacted in 1983 by No. 83-210, § 1, of the 1983 Public Acts, enunciated those procedures.[8]

A probable cause hearing, unlike a grand jury proceeding, is not veiled in secrecy. See *In re Final Grand Jury Report Concerning the Torrington Police Dept.*,

---

offered. The court shall not allow the accused person to present such evidence unless the court determines that such evidence would be sufficient to rebut the finding of probable cause.

"(c) If, from the evidence presented pursuant to subsection (b) of this section, it appears to the court that there is probable cause to believe that the accused person has committed the offense charged, the court shall so find and approve the continuance of the accused person's prosecution for that offense. A determination by the court that there is not probable cause to require the accused person to be put to trial for the offense charged shall not operate to prevent a subsequent prosecution of such accused person for the same offense." (Emphasis added.)

[8] See footnote 7.

197 Conn. 698, 707, 501 A.2d 377 (1985) ("grand jury proceedings have always been presumptively secret"); *State* v. *Hayes*, 127 Conn. 543, 580, 18 A.2d 895 (1941) (same); *State* v. *Kemp*, 126 Conn. 60, 68, 9 A.2d 63 (1939) (same). At a probable cause hearing, the defendant has the right to counsel and may attend, as well as "participate in such hearing, present argument to the court, cross-examine witnesses against him and obtain a transcript of the proceedings at his own expense. . . ." General Statutes § 54-46a (b). Moreover, a hearing in probable cause presumptively is open to the public and the court is confined to the rules of evidence, with the exception of written reports of expert witnesses and matters involving the chain of custody of evidence. General Statutes § 54-46a (b).

A probable cause hearing, however, was not designed to be a "mini trial." 26 H.R. Proc., Pt. 8, 1983 Sess., p. 2941, remarks of Representative Alfred J. Onorato. The defendant, therefore, pursuant to § 54-46a, is not entitled to make a motion to suppress or for discovery. Moreover, a defendant is not necessarily permitted to present evidence and call witnesses. At the close of the prosecution's case, however, if the court finds that probable cause exists, the defendant "may make a specific offer of proof, including the names of witnesses who would testify or produce the evidence offered. The court shall not allow the [defendant] to present such evidence unless the court determines that such evidence would be sufficient to rebut the finding of probable cause." General Statutes § 54-46a (b).

The state argues that the defendant's motion to unseal the arrest warrant and its supporting affidavits to allow disclosure to defense counsel constitutes a motion for discovery, which is prohibited statutorily in connection with a probable cause hearing. It further argues that Practice Book § 593A and General Statutes § 54-46a can be read harmoniously *only* if a sealed

supporting affidavit is not disclosed to a defendant until after a probable cause hearing has been held. See *State* v. *Kozlowski*, 199 Conn. 667, 678, 509 A.2d 20 (1986) (" '[t]he point of the rules of interpretation is to give harmonious effect to all acts on a subject where reasonably possible' "). The defendant, on the other hand, argues that his request for disclosure of the affidavits supporting his arrest warrant is not a motion for discovery. Rather, he contends that the court, pursuant to § 593A, must permit disclosure of the warrant and its supporting affidavits to defense counsel. We agree with the defendant.

Section 593A prescribes the procedure for the sealing of the supporting affidavits of an arrest warrant from public inspection: "At the time the arrest warrant is issued, upon written request of the prosecuting authority and for good cause shown, the judicial authority may order that the supporting affidavits be sealed from public inspection or that disclosure be limited under such terms and conditions as it finds reasonable . . . ." Section 593A was amended, effective October 1, 1987, however, to provide: "No such order shall limit their disclosure to the attorney for the accused, but the judicial authority may place reasonable restrictions on the attorney's further disclosure of the contents of the affidavits. . . ."

Pursuant to § 593A, in *any* criminal case, the attorney for the defendant is entitled to obtain the affidavits supporting the arrest warrant of his or her client. It would be a bizarre result if a defendant accused of a crime not punishable by death or life imprisonment was entitled, pursuant to § 593A, to obtain his arrest warrant and its supporting affidavits immediately after his arrest, yet a defendant accused of a crime punishable by death or life imprisonment would have to wait until after his probable cause hearing to obtain the same documents.

We believe, therefore, that the defendant's request for the affidavits is not properly characterized as a motion for discovery as contemplated in, and prohibited by, § 54-46a. Furthermore, the release of the warrant and its supporting affidavits to the defendant's attorney would not "make a hearing of probable cause into a mini trial, an avenue for discovery, an avenue to argue substantive law, or anything else." 26 H.R. Proc., Pt. 8, 1983 Sess., p. 2941, remarks of Representative Alfred J. Onorato (discussing purpose for proposed enactment of § 54-46a). Rather, a request for the release of the affidavits to counsel is a separate procedure,[9] pursuant to the rules of practice, that is compatible with and can coexist with § 54-46a. This procedure is more in keeping with the openness of probable cause hearings, as opposed to grand jury proceedings, wrought by § 54-46a. We conclude, therefore, that the trial court improperly denied the defendant's request to release the arrest warrant and its supporting affidavits to his attorney.

B

We now need to determine whether the trial court's refusal to release the arrest warrant and its supporting affidavits to the defendant "was so prejudicial to the rights of the defendant as to deprive him of a fair trial, and so, to constitute harmful error. See *State* v. *Daniels*, 180 Conn. 101, 111, 429 A.2d 813 (1980); *State* v. *Kinsey*, 173 Conn. 344, 348, 377 A.2d 1095 (1977); *State* v. *L'Heureux*, 166 Conn. 312, 324, 348 A.2d 578 (1974)." *State* v. *Ruth*, 181 Conn. 187, 196, 435 A.2d 3 (1980).

The defendant claims that he was prejudiced by the court's failure to release the supporting affidavits only

---

[9] The defendant points out that § 593A is in the chapter of the Practice Book entitled "Procedure Prior to Appearance," as opposed to the chapter entitled "Discovery and Depositions." The discovery chapter encompasses §§ 731 through 805 of the Practice Book.

in that he was deprived of potentially exculpatory evidence and consequently his right to due process was violated.[10] The defendant conceded that he would not have done anything differently at the probable cause hearing had his attorney received the warrant and its supporting affidavits prior to the hearing, and, therefore, the result of that proceeding would not have been affected. Rather, the defendant argues that had his attorney received the supporting affidavits prior to the probable cause hearing, his attorney would have been aware that the police had discovered the T-shirt and baseball cap at the crime scene, would have concluded that they were repositories of hair and could have requested that comparison hair samples be collected from the defendant within the two month window before the pigment of his hair might be altered due to the change in his diet and environment.[11] We conclude that the trial court's failure to release the affidavits prior to the probable cause hearing was harmless.

" '[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.' *Chapman* v. *California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705, reh. denied, 386 U.S. 987, 87 S. Ct. 1283, 18 L. Ed. 2d 241 (1967); *State* v. *Pittman*, 209 Conn. 596, 608–609, 553 A.2d 155 (1989); *State* v. *Plourde*, 208 Conn. 455, 469, 545 A.2d 1071 (1988); *State* v. *Green*, 207 Conn. 1, 9, 540 A.2d 659 (1988). The state bears the burden of demonstrating that the constitutional error was harmless beyond a reasonable doubt. *State*

---

[10] Because the defendant's claim that the state destroyed potentially exculpatory evidence was not brought under the due process clause of the Connecticut constitution, we limit our discussion of this issue to the United States constitution.

[11] The defendant was in custody from the time that he was arrested through the duration of his trial. Thus, it is not implausible that his hair pigment had the potential to change since his diet and environment undoubtedly were altered drastically due to his confinement.

v. *Colton,* 227 Conn. 231, 253–54, 630 A.2d 577 (1993). That determination must be made in light of the entire record. See *State* v. *Francis,* 228 Conn. 118, 125, 635 A.2d 762 (1993)." *State* v. *Daugaard,* 231 Conn. 195, 212, 647 A.2d 342 (1994), cert. denied,     U.S.    , 115 S. Ct. 770, 130 L. Ed. 2d 666 (1995). Stated another way, the question is whether it is reasonably possible that the court's refusal "affected the verdict." *State* v. *Tropiano,* 158 Conn. 412, 427, 262 A.2d 147 (1969), cert. denied, 398 U.S. 949, 90 S. Ct. 1866, 26 L. Ed. 2d 288 (1970); see *State* v. *Carter,* 228 Conn. 412, 428, 636 A.2d 821 (1994); *State* v. *Colton,* 227 Conn. 231, 254, 630 A.2d 577 (1993); *State* v. *Mason,* 186 Conn. 574, 585–86, 442 A.2d 1335 (1982).

We conclude, after a review of the record, that the state has met its burden. Settachatgul testified that the hair recovered from the T-shirt and the baseball cap did not match the samples collected from the defendant, his brother or Smith. Settachatgul's testimony regarding the hair samples, therefore, was obviously exculpatory. Additionally, Settachatgul testified that microscopical hair comparison is not a *positive* means of identification because every individual's hair is not distinct as are, for instance, fingerprints. Moreover, hair from one person may be found on another person's clothing, and, again unlike fingerprints, a person's hair may change because of, inter alia, a change in diet or environment. Hair sample evidence, therefore, never will be dispositive.

The defendant argues nonetheless that the state prevented him from discovering potentially superior exculpatory evidence by withholding the supporting affidavits of his arrest warrant until three months after the murder. He claims that the failure of the samples to match the hair found on the T-shirt and baseball cap would have seemed even more exculpatory than it did, if the samples had been obtained promptly and had been

analyzed before the possibility of change arose. He argues, therefore, that he lost the opportunity to exculpate himself more fully by hair comparison because the expert's testimony was less favorable than it would have been had he not also testified that the hair samples could have been different than the hair on the T-shirt and baseball cap by reason of time, diet and environment. The defendant, however, did not request a hair comparison until October, 1993, ten months[12] after he had received the supporting affidavits that referred to the T-shirt and baseball cap. There is no indication that had the defendant received the affidavits earlier he would have asked for a hair comparison within a shorter period of time. Moreover, considering the testimony concerning the fallibility of hair comparisons, there is no indication that the outcome of the trial would have been affected had the samples been obtained sooner. See *State* v. *Carter*, supra, 228 Conn. 428; *State* v. *Tropiano*, supra, 158 Conn. 427.

Finally, the defendant contends that the state has failed to satisfy its burden to prove that the trial court's failure to release the arrest warrant and its supporting affidavits was harmless, because the testimony relating to the T-shirt and baseball cap were paramount to the state's case. We disagree. While it is true that testimony regarding the T-shirt and baseball cap were used at trial to identify the shooter, testimony regarding the hair found on those items of clothing was not central to the state's case. Rather, the T-shirt and baseball cap were important to the state only to corroborate the testimony of the witnesses who testified that they saw the defendant with his brother Bassell, and Bassell was wearing a light colored T-shirt and a black baseball cap at the time of the shooting, but was wearing

---

[12] In response to the defendant's motion for discovery filed on December 14, 1992, the trial court, *McGrath, J.*, ordered open file review on December 21, 1992.

something else immediately thereafter. The T-shirt and baseball cap, in other words, were consequential to the state's case only because they tied Bassell to the crime and the evidence tied the defendant to Bassell.

Moreover, the evidence of the defendant's guilt was overwhelming. Several witnesses placed the defendant, his brother and Smith outside of the alley with the murder weapon, discussing the possibility of robbing someone, just ten to fifteen minutes before the shooting. Heard and Terrel Staton testified that the defendant's brother was wearing a black baseball cap at that time. Perkins testified that the shooter had on a light colored T-shirt and a black baseball cap and identified the defendant as one of the individuals involved in the attack on the victim. Council identified the defendant as one of the individuals that she had seen attack and shoot the victim. Mourning gave a statement that just after the shooting the defendant's brother told him that he had shot somebody. Finally, Jones testified that two days after the shooting, the defendant confessed to him that he, his brother and Smith had shot someone in the alley.

In light of this overwhelming evidence, we conclude that had the defendant's attorney received the arrest warrant and its supporting affidavits prior to the probable cause hearing, it is not reasonably possible that the outcome of the trial would have been affected. See *State* v. *Carter*, supra, 228 Conn. 428; *State* v. *Mason*, supra, 186 Conn. 585–86; *State* v. *Tropiano*, supra, 158 Conn. 427; see also *State* v. *Ruscoe*, 212 Conn. 223, 244, 563 A.2d 267 (1989), cert. denied, 493 U.S. 1084, 110 S. Ct. 1144, 107 L. Ed. 2d 1049 (1990) (harmless error when evidence of defendant's guilt overwhelming); *State* v. *Pittman*, 209 Conn. 596, 608–609, 553 A.2d 155 (1989) (same). The failure of the trial court to

release the affidavits, therefore, was harmless beyond a reasonable doubt. See *State* v. *Daugaard*, supra, 231 Conn. 212.

## III

In addition to his claim that he was constitutionally entitled to receive the affidavits earlier, the defendant also raises a claim of instructional error. Although he does not assert that the T-shirt and baseball cap should have been suppressed, he maintains that the court, in referring to the T-shirt and baseball cap, should have instructed the jury that "[t]he failure of the state to produce evidence within its power to produce and which should have been produced by the state pursuant to its duty to offer all the available evidence to aid the jury in ascertaining the truth permits the inference that the evidence not produced would have been unfavorable to the state."[13] The trial court refused the defendant's request to charge. The defendant claims that the trial court was incorrect in doing so. He argues that the state's failure to conduct a prompt hair comparison of the defendant's hair with the hairs found on the T-shirt and baseball cap was akin to the state not producing the evidence at all, to his detriment.

---

[13] The defendant's request to charge provides in relevant part: "The failure of the state to produce evidence within its power to produce and which should have been produced by the state pursuant to its duty to offer all the available evidence to aid the jury in ascertaining the truth permits the inference that the evidence not produced would have been unfavorable to the state. This adverse inference is a permissive one. That is, you may draw the inference but you are not required to depending on whether you think it is a reasonable and logical inference. . . .

"What we are talking about here is the failure of the state to examine the hat and shirt seized at the scene of the crime in a timely fashion to determine if any hair strands or fibers were on the hat and shirt. Because of the year-long delay in the state's examination of such items of evidence it was impossible for the defendant to prove conclusively that the hair strands found were not the hair strands of the defendant or the co-defendants and thereby eliminate any of them as the persons who may have been wearing those items of clothing on the night of the shooting."

The jury charge requested by the defendant was inappropriate. "[T]he police do not have a constitutional duty to perform any particular tests." *Arizona* v. *Youngblood*, supra, 488 U.S. 59; see also *United States* v. *Rodriguez*, 917 F.2d 1286, 1291 (11th Cir. 1990), cert. denied sub nom. *Leon* v. *United States*, 502 U.S. 1047, 112 S. Ct. 911, 116 L. Ed. 2d 811 (1992) ("*Brady* and its progeny apply to evidence possessed either by the prosecutor or by someone over whom he has control. . . . Materials not possessed by the government cannot be suppressed within the meaning of *Brady*." [Citation omitted.]); *Everroad* v. *State*, 570 N.E.2d 38, 46–47 (Ind. App. 1991), superseded on other grounds, 590 N.E.2d 567 (Ind. 1992) (rejecting claim that failure to test contraband for fingerprints constituted destruction of potentially exculpatory evidence); *Commonwealth* v. *Richenburg*, 401 Mass. 663, 669, 518 N.E.2d 1143 (1988) (failure to perform blood typing analysis permissible ground on which to build defense but does not constitute destruction of potentially exculpatory evidence). The state, in fact, did preserve the evidence that it had in its possession and produced it at trial. The defendant, however, argues that the state had an obligation under the federal constitution to provide him with the evidence sooner because the test results may have proven more exculpatory if the hair comparison had been conducted earlier. The state, however, is under no such obligation. See *Arizona* v. *Youngblood*, supra, 59.

Moreover, the defendant's request to charge was logically flawed. His request read: "*Because of* the year-long delay in the state's examination of such items of evidence it was *impossible* for the defendant to prove *conclusively* that the hair strands found were not the hair strands of the defendant or the co-defendants and thereby eliminate any of them as the persons who may have been *wearing* those items of clothing on the night

of the shooting.'' (Emphasis added.) While the evidence of the hair comparison when done was not conclusive, hair comparison evidence never is conclusive because, even if hair found on a piece of clothing exactly matches a hair sample, it does not follow, as the defendant contends, that: (1) the person from whom the sample was obtained was wearing the clothing; (2) the suspect's hair would remain the same for any period of time;[14] or (3) hair comparison *positively* could identify an individual. It is not because of the state's delay that the defendant was unable conclusively to eliminate himself and his codefendants as the persons wearing the clothing found at the murder scene. Rather, the defendant and his codefendants could not be eliminated as the persons wearing the clothing because it is impossible, by the very nature of the process, to eliminate a suspect conclusively through hair comparison.

The judgment is affirmed.

In this opinion PETERS, C. J., and NORCOTT and PALMER, Js., concurred.

BERDON, J., concurring. I agree with the result reached in this case and with much of the analysis contained in the majority opinion. I write separately on the issue of whether the arrest warrant and its supporting affidavits should have been disclosed to the defendant or his attorney prior to the defendant's hearing in probable cause. Although I reach the same result as the majority, I base my decision on a different analysis.

[14] Settachatgul also testified that hair pigment could change if a person chemically treated his or her hair. Thus, hair comparison evidence would not be conclusive, even if hair samples were collected from a suspect on the same day that the crime had been committed, because the suspect could chemically treat his or her hair before the samples were collected. Hair comparison evidence, therefore, cannot provide conclusive evidence exonerating a suspect and, unlike fingerprinting, is not a positive means of identification.

In this case, the court ordered the arrest warrant and its supporting affidavits sealed pursuant to Practice Book § 593A[1] because the police investigation was ongoing and because minors were involved. Section 593A, however, specifically provides that no such order to seal these documents "shall limit their disclosure to the attorney for the accused, but the judicial authority may place reasonable restrictions on the attorney's further disclosure of the contents of the affidavits." Nevertheless, General Statutes § 54-46a,[2] which sets forth the procedures governing hearings in probable cause for persons charged with crimes punishable by

---

[1] Practice Book § 593A provides: "All affidavits submitted to the judicial authority in support of the application for an arrest warrant and from which a determination of probable cause for the issuance of an arrest warrant has been made shall be filed with the clerk of the court together with the return of the arrest warrant pursuant to Sec. 972 and thereafter remain a part of the court file.

"At the time the arrest warrant is issued, upon written request of the prosecuting authority and for good cause shown, the judicial authority may order that the supporting affidavits be sealed from public inspection or that disclosure be limited under such terms and conditions as it finds reasonable, subject to the further order of any judicial authority thereafter having jurisdiction of the matter. No such order shall limit their disclosure to the attorney for the accused, but the judicial authority may place reasonable restrictions on the attorney's further disclosure of the contents of the affidavits.

"Any order sealing such affidavits from public inspection or limiting their disclosure shall be for a specific period of time, not to exceed two weeks from the date of arrest, and within that time period the prosecuting authority may seek an extension of the period. Affidavits which have been the subject of such an order shall remain in the custody of the clerk's office but shall be kept in a secure location apart from the remainder of the court file.

"Unless the judicial authority issuing an arrest warrant has, upon written request of the prosecuting authority, entered an order limiting disclosure of the supporting affidavits, all affidavits filed pursuant to this section shall be open to public inspection and copy and the clerk shall provide copies to any person upon receipt of any applicable fee."

[2] General Statutes § 54-46a provides: "(a) No person charged by the state, who has not been indicted by a grand jury prior to May 26, 1983, shall be put to plea or held to trial for any crime punishable by death or life imprisonment unless the court at a preliminary hearing determines there is probable cause to believe that the offense charged has been committed and that

death or life imprisonment, prohibits discovery. On the basis of this statutory provision, the trial court refused to order the state to disclose the warrant or its supporting affidavits to the defendant or his attorney at or before the hearing in probable cause.

The majority overcomes this "bizarre result"[3] by concluding that the disclosure of an arrest warrant and its supporting affidavits is not discovery. Although I

the accused person has committed it. The accused person may knowingly and voluntarily waive such preliminary hearing to determine probable cause.

"(b) Unless waived by the accused person or extended by the court for good cause shown, such preliminary hearing shall be conducted within sixty days of the filing of the complaint or information in superior court. The court shall be confined to the rules of evidence, except that written reports of expert witnesses shall be admissible in evidence and matters involving chain of custody shall be exempt from such rules. No motion to suppress or for discovery shall be allowed in connection with such hearing. The accused person shall have the right to counsel and may attend and, either individually or by counsel, participate in such hearing, present argument to the court, cross-examine witnesses against him and obtain a transcript of the proceedings at his own expense. At the close of the prosecution's case, if the court finds that, based on the evidence presented by the prosecution, probable cause exists, the accused person may make a specific offer of proof, including the names of witnesses who would testify or produce the evidence offered. The court shall not allow the accused person to present such evidence unless the court determines that such evidence would be sufficient to rebut the finding of probable cause.

"(c) If, from the evidence presented pursuant to subsection (b) of this section, it appears to the court that there is probable cause to believe that the accused person has committed the offense charged, the court shall so find and approve the continuance of the accused person's prosecution for that offense. A determination by the court that there is not probable cause to require the accused person to be put to trial for the offense charged shall not operate to prevent a subsequent prosecution of such accused person for the same offense."

[3] According to the majority opinion, "[i]t would be a bizarre result if a defendant accused of a crime not punishable by death or life imprisonment was entitled, pursuant to § 593A, to obtain his arrest warrant and its supporting affidavits immediately after his arrest, yet a defendant accused of a crime punishable by death or life imprisonment would have to wait until after his probable cause hearing to obtain the same documents."

agree with the result, this reasoning eludes me. Surely, ordering the disclosure of an arrest warrant and supporting affidavits is discovery.

In my view, the prohibition of all discovery under § 54-46a violates article second of the state constitution, which pertains to the distribution of power between the three branches of government. Although in *Bartholomew* v. *Schweizer*, 217 Conn. 671, 680–81, 587 A.2d 1014 (1991), we made clear that a determination of the court's procedural rules are a shared power between the judicial and legislative branches of government, the separation of powers concerns articulated in *State* v. *Clemente*, 166 Conn. 501, 506–507, 353 A.2d 723 (1974), was not completely emasculated. Any rule of procedure adopted by the legislature must yield to the inherent powers of the court to administer justice. See *State* v. *Darden*, 171 Conn. 677, 679, 372 A.2d 99 (1976) ("[a] statute can overstep constitutional bounds . . . if it establishes a significant interference with the orderly conduct of the Superior Court's judicial functions"). To deprive a defendant of discovery, which may produce evidence that is necessary to effectively cross-examine witnesses at a hearing in probable cause, would interfere with the administration of justice. To that extent, any statutory prohibition must constitutionally give way to the court's own rules.

Furthermore, the statutory prohibition's interference with cross-examination during the hearing in probable cause could have significant consequences later, during the trial of the defendant. For example, the state would be prohibited from introducing at trial the hearing testimony of a witness under the "former testimony" exception to the hearsay rule[4] if the defendant

---

[4] "Evidence of a witness's testimony at a prior proceeding may be received in a pending proceeding as an exception to the hearsay rule if certain requirements are met." C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 11.4.1, p. 325.

had been deprived of the opportunity for effective cross-examination of the missing witness. The former testimony of the missing witness would be excluded because it would not bear "adequate indicia of reliability." *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980); *State v. Munoz*, 233 Conn. 106, 149, 659 A.2d 683 (1995) *(Berdon, J.,* concurring); *State v. Outlaw*, 216 Conn. 492, 505, 582 A.2d 751 (1990). Simply put, the state cannot have it both ways: it cannot both withhold information necessary for the effective cross-examination of a witness during the hearing in probable cause, and then also seek to admit that hearing testimony later during trial under the former testimony or another exception to the hearsay rule.

Nevertheless, I agree with the majority that, under the circumstances of this case, the failure to unseal the arrest warrant and its supporting affidavits and to order their disclosure was harmless error.

Accordingly, I concur in the result.